UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════

UNITED STATES OF AMERICA

                                                    1-09-CR-329
            v.                                      DECISION AND ORDER

THAMUD ELDRIDGE, et al.,

                    Defendants.

═══════════════════════════════════

## INTRODUCTION

Defendant Thamud Eldridge and defendant Kevin Allen have moved to vacate their convictions and for a new trial.  (Dkt. Nos. 682 and 695, 704)  For the following reasons, Eldridge and Allen's motions are denied in their entirety.

## BACKGROUND AND RELEVANT FACTS

In this case, the Government contended that Eldridge and Allen were members of a criminal organization that engaged in the distribution of cocaine, cocaine base, marijuana, and heroin and also committed acts of violence in furtherance of their drug trafficking enterprise, including murder, robbery and extortion.  It was alleged that defendants and others targeted and robbed drug dealers of money and controlled substances, and that they used firearms, extortion and violence to expand their territory and power.  In addition to various racketeering, narcotics, and weapons crimes, the Government alleged that Eldridge and Allen kidnapped and robbed Woodie Johnson, a cocaine dealer, in February of 2005 and robbed and murdered Sam Jones, also a cocaine dealer, in April of 2005.  The Government also alleged that, in a separate incident in April of 2005, Eldridge robbed and murdered Thedrus Laster, a marijuana dealer.

*Indictment*

On June 20, 2012, defendants Eldridge and Allen were charged, in a Superseding Indictment ("Indictment"), with racketeering (Count 1, in violation of 18 U.S.C. §1962(c)); racketeering conspiracy (Count 2, in violation of 18 U.S.C. §1962(d)); narcotics conspiracy (Count 3, in violation of 21 U.S.C. §846); possession of firearms in furtherance of drug trafficking (Count 4, in violation of 18 U.S.C. §§924(c)(1) and (2)); kidnapping in aid of racketeering (Count 5, in violation of 18 U.S.C. §§1959(a)(1) and (2)); Hobbs Act robbery (Count 6, in violation of 18 U.S.C. §§1951 and 2), and possess and brandish of a firearm in furtherance of violent crime (Count 7, in violation of 18 U.S.C. §§924(c)(1)(A)(ii) and 2). (Dkt. No. 164) Counts 5, 6 and 7 related to the kidnapping and armed robbery of Johnson. Defendant Galen Rose was charged with possession with intent to distribute marijuana (Count 8, in violation of 21 U.S.C. §841(a)(1)) and conspiracy to distribute marijuana (Count 9, in violation of 21 U.S.C. §846). *Id.* Eldridge was charged in Count 10 (murder in aid of racketeering, in violation of 18 U.S.C. §§1959(a)(1) and 2), Count 11 (Hobbs Act robbery, in violation of 18 U.S.C. §§1951 and 2), and Count 12 (discharge of firearm causing death, in violation of 18 USC §§§924(c)(1)(A)(iii), 924(j)(1) and 2), relating to the robbery and death of Laster on April 3, 2005. *Id.* Rose was also charged in Count 11 (Hobbs Act robbery) and Count 12 (discharge of a firearm causing death), related to the robbery and death of Laster. *Id.* Eldridge and Allen were charged in Count 13 (murder in aid of racketeering), Count 14 (Hobbs Act robbery), and Count 15 (discharge of firearm causing death), relating to the robbery and death of Jones on April 6, 2005. *Id.*

Kashika Speed, a fourth defendant, was also charged in a number of counts including racketeering, racketeering conspiracy, narcotics conspiracy, possession of firearms in furtherance of drug trafficking, as well as the counts related to the kidnapping and robbery of Johnson, the robbery and murder of Laster, and the conspiracy to rob Jones. Speed entered into a plea agreement with the Government on June 16, 2014. On October 2, 2014, Speed was sentenced by the Court to a period of incarceration of 192 months.

Eldridge was further charged in Count 16 (possession and discharge of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. §§924(c)(1)(A)(iii) and 2) and Count 17 (felon in possession of firearm, in violation of 18 U.S.C. §§§922(g)(1), 924(a)(2) and 2). (Dkt. No. 164) On January 7, 2016, the Court issued a Decision and Order severing Counts 16 and 17 from the rest of Indictment. (Dkt. No. 530)

### Trial and Jury Verdict

On January 6, 2016, a jury trial commenced as to defendants Eldridge, Allen and Rose on Counts 1 through 15 of the Indictment. Following a five and one-half week trial, the jury found Eldridge guilty of racketeering (Count 1). (Dkt. No. 617) With respect to the racketeering act findings, the jury found that Eldridge conspired to distribute controlled substances, attempted to commit a robbery at 87 Girard Street, kidnapped and robbed Johnson on February 23, 2005, and possessed cocaine with intent to distribute on February 23, 2005. *Id.* The jury found Eldridge not guilty as to the racketeering acts involving the robbery of Larry Kemp and the intentional murder of Laster. The jury was unable to reach a verdict as to the racketeering acts which involved the robbery of Laster and the causing of his death in the course of the robbery. *Id.* The jury was also unable

to reach a verdict as to any of the racketeering acts which involved the robbery and murder of Jones. *Id.* The jury found Eldridge guilty of racketeering conspiracy (Count 2), narcotics conspiracy (Count 3), possession of firearms in furtherance of drug trafficking (Count 4), and the kidnapping and robbery of Johnson at gunpoint (Counts 5, 6 and 7). *Id.* The jury found Eldridge not guilty of murder in aid of racketeering as to Thedrus Laster (Count 10). Also as to Eldridge, the jury was unable to reach a verdict on the robbery of Laster and the use of a firearm causing his death (Counts 11 and 12), and was unable to reach a verdict as to the murder and robbery of Jones as well as the use of a firearm causing his death (Counts 13, 14 and 15). *Id.* The jury found Allen guilty of racketeering (Count 1). *Id.* With respect to the racketeering act findings, the jury found that Allen conspired to distribute controlled substances, and that he conspired to rob Johnson on February 23, 2005. *Id.* The jury found that Allen did not commit the robbery of Larry Kemp, and was unable to reach a verdict as to whether Allen kidnapped Johnson and possessed cocaine with intent to distribute on February 23, 2005. *Id.* The jury was also unable to reach a verdict as to whether Allen committed the racketeering acts involving the robbery and murder of Sam Jones. *Id.* The jury found Allen guilty of racketeering conspiracy (Count 2), narcotics conspiracy (Count 3), and possession of firearms in furtherance of drug trafficking (Count 4). The jury found Allen guilty of conspiring to rob Woodie Johnson (Count 6), but was unable to reach a verdict as to whether Allen kidnapped Johnson in aid of racketeering and used a firearm to rob and kidnap Johnson (Counts 5 and 7). Also with respect to Allen, the jury was unable to reach a verdict as to the murder and robbery of Jones as well as the use of a firearm causing his death (Counts 13, 14 and 15). The jury found Rose guilty of possession with intent to distribute

marijuana (Count 8) and conspiracy to possess with intent to distribute marijuana (Count 9). The jury was unable to reach a verdict as to whether Rose robbed Laster or discharged a firearm causing his death (Counts 11 and 12).[1]

Following the verdict, motions were filed by both the Government and defense counsel regarding whether retrial of Eldridge and Allen on the hung counts should be deferred until there was a resolution of the appeal of the counts of conviction, when the Court should try the severed counts (Counts 16 and 17) as to Eldridge, and whether the severed counts should be tried together with the hung counts. Also during that time, Eldridge's trial counsel filed a motion to withdraw from the case. The Court granted the motion to withdraw, appointed new counsel for Eldridge and provided counsel time to familiarize himself with the record. On October 4, 2016, the Court issued a Decision and Order declaring a mistrial as to the hung counts and granting the Government's request to defer a trial of the hung counts until the counts of conviction were resolved through post-trial motions and any subsequent appeals. (Dkt. No. 677) The Court also granted Eldridge's request to adjourn the trial of the severed counts pending the outcome of any post-trial motions. *Id.* The Court reasoned, in part, that combining a potential trial of the hung and severed counts until after the conclusion of the appeal of the counts of conviction would benefit judicial economy and Eldridge, in that he would only face one potential trial as opposed to two and the Government, depending on the outcome of the appeal, may decide not to pursue all of the remaining counts against him. *Id.*

---

[1] On June 29, 2016, the Government and Rose entered into a Stipulation whereby Rose agreed to waive his right to appeal his convictions as to Counts 8 and 9, and that the relevant conduct proven at trial established the basis for an aggregate sentence of 10 years as to those counts. (Dkt. No. 645) The parties agreed to waive their right to appeal a sentence of 120 months on Counts 8 and 9 and the Government agreed to dismiss Count 11 with prejudice and Count 12 without prejudice. *Id.* On October 6, 2016, Rose was sentenced to a term of 120 months incarceration.

Allen filed a motion to vacate his counts of conviction and for a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure on January 17, 2017. (Dkt. No. 682)  Eldridge filed a motion to vacate his counts of conviction and for a new trial pursuant to the same on March 3, 2017, and filed a supplemental affidavit in support of his motion on April 4, 2017.  (Dkt. No. 695, 704)  The Government filed responses to both motions.  (Dkt. Nos. 690 and 703)  The Court heard oral argument as to defendants' motions on July 28, 2017, at which time the Court considered the matter submitted.

## DISCUSSION

### *Rule 29*

Pursuant to Federal Rule of Criminal Procedure 29(a), a district court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction."  *See* Fed. R. Crim. P. 29(a).  A motion for a judgment of acquittal may be granted after the evidence on either side is closed if the evidence is insufficient to sustain a conviction for the crime charged.  *See* Fed. R. Crim. P. 29(a).  The Supreme Court has instructed that the standard, under Rule 29, is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Castelin*, 597 Fed. Appx. 22 (2d Cir. 2015); *accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Court must resolve all inferences in favor of the prosecution, and must view the proof in the light most favorable to the government.  *See United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991).  A defendant challenging the sufficiency of the evidence "bears a heavy burden."  *United States v. Griffin*, 284 F.3d 338, 348 (2d Cir. 2002).  To that end, in resolving a Rule 29 motion, a court must not assess witness credibility, resolve

inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence. *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). *See also United States v. Cote*, 544 F.3d 88, 93 (2d Cir. 2008) (a court should not grant a Rule 29 motion by rejecting government evidence as not credible); *United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000) (a court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony").

<u>Defendant Allen: Robbery of Woodie Johnson</u>

Allen argues that there was insufficient evidence to convict him of conspiring to rob Woodie Johnson on February 23, 2005 and therefore the Court should enter a judgment of acquittal as to Count 1 (racketeering), Count 2 (racketeering conspiracy) and Count 6 (Hobbs Act robbery).[2] Allen contends that the testimony of Steve Martin, a witness to the planning of the robbery, and Johnson, the victim of the robbery, was wholly inconsistent and could not be reconciled by a rational trier of fact, and that Martin was not a credible witness. Allen further argues that since the jury hung on whether he actually robbed Johnson (Counts 5 and 7), the testimony of Martin was insufficient to convict him of conspiring to rob Johnson. Contrary to defendant's contentions, the Court finds sufficient evidence to sustain the conviction for conspiracy to rob Johnson.

During the trial, Martin testified that he was involved in drug dealing on Montana Street in the City of Buffalo from the time he was 14 years old. (Dkt. No. 594, pg. 9) Martin testified that he was a member of the Montana Bridge Gang from the mid 1990's through the early 2000's and various times after that when he was not incarcerated. (*Id.*

---

[2] Allen contends that because he was only found guilty of the racketeering acts of narcotics conspiracy and conspiracy to rob Johnson (Hobbs Act robbery), an acquittal as to the Hobbs Act robbery would leave him with a judgment of guilty as to only one racketeering act as opposed to two, and would necessitate his acquittal as to the racketeering and racketeering conspiracy counts.

at 10)  He testified that he and other gang members would sell heroin and crack, and commit burglaries and robberies.  (*Id.*)  Martin testified that he and Allen were close friends, that they lived in the same neighborhood and that they have known each other since the 1980's.  (*Id.* at 11, 12-13)  He testified that Allen and Kashika Speed, Eldridge's cousin, were members of the Montana Bridge Gang.  (*Id.* at 16)  Martin testified that, from the 90's through 2005, he saw Allen sell bundles of heroin and possess firearms while selling drugs.  (*Id.* at 16, 29)  Martin testified that when he and Allen were incarcerated together at Gouvernor Correctional Facility, they talked about robbing Johnson and other drug dealers.  (*Id.* at pg. 34)  He testified that Allen told him that he knew where Johnson lived and that Johnson was "a pretty big guy in the drug game."  (*Id.* at 39)  Martin testified that he and Allen spoke about robbing Johnson quite a few times and that Allen told him "he needed a team".  (*Id.* at 39, 41)

Martin further testified that after he and Allen were released from prison, they would meet at the Island Store on the corner of Montana Street and Genesee Street in the city of Buffalo and discuss robberies.  (*Id.* at 46)  Allen told Martin that "the robberies was on and he was doing a lot of robberies", and that Martin should get involved with him. (*Id.*)  Martin further testified that Allen informed him that he was participating in robberies with Eldridge and Speed.  (*Id.* at 53)  Martin testified that there came a time when he met with Eldridge, Allen and Speed in the basement of Leo Jones' home on Newburgh Street in Buffalo.  (*Id.* at 56-58)  They spent an hour talking about robbing drug dealers, including Johnson.  (*Id.* at 58-59)  Martin testified that between January and May of 2005, he met with Allen, Speed and Eldridge in the Newburgh Street home approximately 12 times,

and that robbing drug dealers, specifically Johnson and Sam Jones, Jr., was discussed during every meeting.  (*Id.* at 64-65)

Martin testified that on February 23, 2005, Allen drove him over to the Newburgh Street home at approximately 5:30 p.m., and told him that tonight they were going to rob Johnson.  (*Id.* at 73-74)  Once there, Martin met with Allen, Speed, Eldridge and another drug dealer from the neighborhood.  (*Id.*)  Martin testified that Allen, who was "doing the talking", indicated that they would rob Johnson that evening.  (*Id.* at 76-77).  Martin testified that both Eldridge and Allen had guns, and that Allen stated they would go to Johnson's home on Kensington Avenue, wait for him to arrive, and rob him.  (*Id.*)  Martin testified that because he was on parole and had a curfew, he then went home to check in.  (*Id.*)  He intended to return around 11:00 p.m. to participate in the robbery.  (*Id.*)  Martin testified that after checking in with his parole officer, he went to Montana Street to sell drugs.  (*Id.* at 78)  He later returned to the house on Newburgh Street to "check on the robbery".  (*Id.* at 78)  However, no one answered the door.  (*Id.*)  Martin testified that Allen came to his house the next day and told him that he missed the robbery.  (*Id.* at 78-79)  Allen told him that they went to Johnson's home on Kensington Avenue, that Johnson was outside with this dog, and that they "threw [Johnson] in his truck".  (*Id.* at 80)  Allen told Martin that Johnson made a phone call and told someone to put two kilograms of cocaine and $30,000 on a porch, which they took.  (*Id.*)  He stated that Eldridge kept one kilogram of cocaine and that he and Speed split the other kilogram.  (*Id.*)  Martin stated that Allen bought shoes for Martin's son for his birthday, and that he gave Martin some money.  (*Id.* at 80-81)

During cross-examination Martin was asked to confirm the date of the Johnson robbery and Martin stated that he did not remember the date or time. Dkt. No. 595, pg. 20. Martin was asked if there was a reason that he recalled that Allen came over the very next day, February 24, 2005, and Martin answered no. (*Id.* at 20-21) Defense counsel then asked Martin if he told the grand jury that the reason he remembered that Martin visited the next day was because it was his son's birthday. *Id.* However, his son's birthday was not was not until March 6, while the day after the robbery was February 24, 2005. *Id.*

Woodie Johnson testified that in 2004 and 2005 he was selling drugs and that he had the ability to obtain kilograms of cocaine. Dkt. No. 597, 9-10. Also at that time Johnson was working in the linen department at Millard Fillmore Hospital from 6:00 a.m. to 2:30 p.m. (*Id.* at 16) Johnson testified that upon completion of his shift at 2:30 p.m., he would engage in drug trafficking. *Id.* He testified that, at that time, he was living on Kensington Avenue in Buffalo. (*Id.* at 17) Johnson testified that on February 23, 2005, he left his job at Millard Fillmore at 2:30 p.m., at which time he received a call to pick up his dog from the veterinarian before 5 p.m. (*Id.*) He also received a call indicating that Randy Jarrett wanted to purchase two kilograms of cocaine from him. (*Id.* at 27) Johnson testified that he picked up his dog and then proceeded to his home on Kensington to pick up the cocaine, which he had stored in one of his cars. (*Id.* at 28-30) Johnson then traveled to Jarrett's house to drop off the cocaine, which was about ten minutes away. (*Id.* at 28-30) Johnson testified that he returned to his home and brought his dog inside, and that he saw footprints outside of his back window. (*Id.* at 35) He went outside to investigate because he was concerned that someone had broken into his garage. (*Id.*)

Johnson went to look in his garage window, and someone came up from behind him and told him not to move. (*Id.* at 27) Johnson then went on to testify about the kidnapping and robbery, and identified Allen as one of his abductors. (*Id.* at 42-58)

Allen argues principally that Martin and Johnson's testimony about the timeline of the robbery cannot be reconciled, since according to Johnson the robbery occurred in the late afternoon, while Martin testified that the planning occurred in the late afternoon while the robbery happened later that evening. It is clear from the testimony that Martin was not present for the actual robbery. Indeed, Martin testified only that the planning occurred around 5:30 p.m., and that the robbery was anticipated to happen later that evening. He never identified a time that the robbery actually occurred. Johnson testified that the robbery happened after he left work at 2:30 p.m., picked up his dog at the veterinarian, picked up two kilograms of cocaine, dropped the cocaine at Jarett's home nearby, and then returned home. While Martin's testimony may suggest that Allen and others planned the robbery to occur later at night and Johnson's testimony indicates that it in fact occurred in the late afternoon or early evening, the accounts are not directly contradictory or inconsistent. Equally unavailing is Allen's argument that Martin's testimony is not credible because he previously testified that the robbery occurred on a different day, specifically the day before his son's birthday. Any inconsistency in the testimony as to the actual time and date of the planning and commission of the robbery is to be resolved by the jury in determining the sufficiency of the evidence and the credibility of the witness accounts, and that resolution cannot be disturbed by this Court on a Rule 29 motion. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("[T]estimonial inconsistencies…revealed on cross-examination" are for the jury to resolve.); *United*

States v. Persico, 645 F.3d 85 (2d Cir. 2011) ("Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."); *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir. 1969) (it is the role of the jury, rather than the court, to determine whether a witness who was "inaccurate, contradictory, and even untruthful in some respects [was still] entirely credible in the essentials of his testimony").

The Court also rejects Allen's argument that a rational fact finder could not have found Martin credible as to the planning of the robbery, since the jury either hung or acquitted on other counts as to which Martin supplied testimony. As previously stated, it is the province of the jury to assess Martin's credibility, and the jury is entitled to credit certain aspects of a witness' testimony while discrediting others. *See United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009) ("The jury is free to believe part and disbelieve part of any witness's testimony.") Finally, the Court rejects Allen's argument that the jury verdict must be overturned because it was unreasonable for a rational fact finder to find Allen guilty of conspiring to rob Johnson (Hobbs Act robbery), but be unable to determine whether Allen kidnapped Johnson in aid of racketeering and used a firearm in the course of robbing and kidnapping him. To the extent that these verdicts are inconsistent, it is well settled that an inconsistent verdict is not a valid basis to overturn the findings of a jury. In *United States v. Powell*, the Supreme Court upheld a jury's verdict acquitting a defendant of conspiracy to possess and possession of cocaine but convicting her of using a telephone to facilitate those crimes. 469 U.S. 57 (1984). The Supreme Court explained that inconsistent verdicts may be the result of compromise, mistake or leniency on a jury's part, and "the general reluctance to inquire into the

workings of the jury…suggest that the best course to take is simply to insulate jury verdicts from review on this ground." *Id.* at 68-69.

<u>Defendant Allen: Narcotics Conspiracy</u>

Allen argues that there was insufficient evidence for the jury to find that he possessed drugs with intent to distribute them or that he was engaged in a narcotics conspiracy.[3] Allen contends that the majority of the testimony regarding his involvement in selling drugs was limited to accounts from before the conspiracy began, that no witnesses testified they bought drugs from or sold drugs to Allen, and that no drugs were seized from him. Allen argues that there was insufficient proof that he received anything of value from robbing drug dealers, and that there was insufficient proof that he robbed drug dealers or sold drugs to increase his position in the enterprise. The Court rejects these arguments and finds, for the reasons stated below, that there was sufficient evidence presented during the trial to convict Allen of narcotics conspiracy.

Jamile Lee testified that he and Allen were friends, that they knew each other since childhood and that they were members of the Montana Bridge Gang. Dkt. No. 592, 97-99. Lee testified that between 1997 and 2001, he and other members of the Montana Bridge Gang, including Allen, were involved with drug dealing and robberies of drug dealers. (*Id.* at 103) Lee testified that between the 1990's and 2001 he observed Allen engaging in drug deals on Montana Street. (*Id.* at 106) Lee testified that, during this time, he also observed Allen represent himself as a member of the Bloods gang. (*Id.* at 712-713)

---

[3] Here again, Allen contends that because he was only found guilty of the racketeering acts of narcotics conspiracy and conspiracy to rob Johnson (Hobbs Act robbery), an acquittal as to the narcotics conspiracy would leave him with a judgment of guilty as to only one racketeering act as opposed to two, and would necessitate his acquittal as to the racketeering and racketeering conspiracy counts.

Timothy Jackson testified that he began selling marijuana, cocaine and crack cocaine around 1997, when he was approximately 14 years old. Dkt. No. 605, pg. 57. He testified that he spent time on Montana Street and that he knew Allen from 1999 through 2004. (*Id.* at 58) Jackson testified that in the summer of 2004 or 2005, Kashika Speed offered to sell him some drugs. (*Id.* at 62) Jackson testified that he previously purchased crack cocaine from Speed, on Montana Street, on two or three occasions. (*Id.* at 63-64) He stated that Eldridge and Allen, who were close friends with Speed, were present during those transactions. (*Id.* at 65) Jackson testified that he often saw Eldridge, Allen and Speed together. (*Id.*) Jackson further testified that on one occasion where he bought drugs from Speed, Allen was standing nearby and smoking marijuana. (*Id.* at 66) Jackson testified that Allen asked him if he had "any problems because of Speed" and displayed a firearm to Jackson. (*Id.* at 67) Jackson testified that in April or May of 2005, he had another interaction with Allen on Reed Street when Jackson was purchasing marijuana from another individual. (*Id.* at 68) Jackson testified that Allen spoke in Blood terminology and had a pistol at his waist. (*Id.*) Specifically, Allen stated "I'm gonna be a Blood forever", and exposed a pistol. (*Id.* at 70) Jackson also testified that he observed teardrop tattoos on Allen's face, which he understood to be a symbol of the Bloods gang. (*Id.* at 71-72) Henry Lloyd testified that sometime in 2003 or 2004, Allen and another individual robbed him of money and crack cocaine. Dkt. No. 595, pg. 95. Lloyd testified that Allen and the other individual had a gun at the time of the robbery, which they kept passing back and forth between them. (*Id.* at 95-96)

As stated previously, Martin testified that he, Allen, Speed and others were members of the Montana Bridge Gang and that, from the late 90's through 2005, he saw

Allen sell bundles of heroin on Montana Street and possess firearms while selling drugs. Also as indicated previously, Martin provided detailed testimony regarding Allen, Speed and Eldridge planning robberies of drug dealers, including Johnson.

While some of this evidence was presented as background of the conspiracy, there also was specific evidence that Allen was observed selling bundles of heroin from the late 90's through 2005 on Montana Street, which is during the time period of the conspiracy changed. There was also evidence that, during the time period of the conspiracy, Allen carried firearms and robbed drug dealers. Specifically, Lloyd testified that Allen robbed him of money and crack cocaine. As to the existence of a conspiracy, Martin provided extensive testimony regarding Allen's discussions and planning of robbing drug dealers with Speed, Eldridge and others. Indeed, Martin was present for approximately 12 of those meetings. There was also evidence that Allen, Eldridge and Speed were often together and that, during the relevant time period, Allen was present and armed when Speed was conducting a drug sale. This evidence, considered in its totality and construed in a light most favorable to the Government, is sufficient for a reasonable fact finder to conclude that Allen was guilty of narcotics conspiracy. *See United States v. Egipciaco*, 287 Fed. Appx. 119, 120 (2d Cir. 2008) (defendant's Rule 29 motion properly denied where there was sufficient proof at trial to convict defendant of conspiracy to distribute cocaine, *inter alia*, where it was shown that defendant agreed to carry out a robbery of a cocaine dealer with a co-defendant and an un-identified co-conspirator); *United States v. Flaharty*, 295 F.3d 182, 200-01 (2d Cir. 2001) (upholding defendant's conviction for narcotics conspiracy where evidence was presented that he supplied firearms to narcotics traffickers and was sometimes paid in narcotics rather than cash, and recognizing that

firearms are "as much tools of the trade as the commonly recognized articles of narcotics conspiracy"). Furthermore, the evidence presented, most specifically the testimony of Martin and Jackson, demonstrated that Allen, along with Speed and others, were part of an enterprise that identified itself as the Montana Bridge Gang or the Bloods, and the primary purpose of which was to sell narcotics and to rob drug dealers of money and narcotics. *See Boyle v. United States*, 556 U.S. 938, 941 (2009) ("an association-in-fact enterprise is simply a continuing unit that functions with a common purpose").

<u>*Defendant Eldridge: Racketeering and Racketeering Conspiracy*</u>

Eldridge argues that his convictions for racketeering (Count 1) and racketeering conspiracy (Count 2) must be dismissed because there was insufficient evidence as to the existence of a racketeering enterprise. Specifically, he contends that there was no evidence that he was part of the Montana Bridge Gang or Newburgh Crew, but rather the only testimony about his gang affiliation came from "jailhouse informants" who indicated that he was a member of the Bloods. Eldridge further argues that there was insufficient evidence that he was part of an enterprise with Allen and Speed, since there was no testimony regarding the group's organizational structure, management or hierarchy, or even its informal identity or purpose. The Court rejects these arguments.

An enterprise is defined as "a group of individuals associated in fact." 18 U.S.C. §1961(4); *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989) (Congress deliberately defined the term enterprise "as broadly as possible"). The Government must prove the existence of an enterprise "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Here, the Indictment alleged that

the enterprise consisted of Eldridge, Allen, Speed and others, known and unknown. These individuals were alleged to be "members of a criminal organization whose members and associates engaged in acts of violence, including murder, robbery and extortion, and narcotics distribution, and which operated principally in the East Side of Buffalo, New York." The Indictment alleged that the principle objective of the enterprise was to obtain money and things of value through acts of, *inter alia*, murder, robbery and drug trafficking, and that Allen, Eldridge and Speed directed other associates to carry out activities in furtherance of these goals. The Indictment further alleged that members of the enterprise and their associates "represented themselves to be and identified themselves as gang members of the Bloods, Montana Street ("Montana Bridge") and Newburgh Crew ("NBC") in order to intimidate victims and rivals, and in order to enhance their street credibility on the East Side of Buffalo."

Sufficient evidence was presented at trial for a reasonable fact finder to conclude that an enterprise, as described in the Indictment, existed and that Eldridge was a member of the enterprise. Specifically, Sam Cuyler testified that he was previously a member of the Bloods, and that he has tattoos which symbolize his prior membership. Dkt. No. 659, pgs. 8-9. Cuyler testified that he met Eldridge at the Chautauqua County Jail in 2009 when they were both incarcerated there. (*Id.* 7-8, 11-12) Cuyler stated that Eldridge noticed his Bloods' tattoo, and that Eldridge told Cuyler that he was a "big homie" in the Bloods. (*Id.* at 13) Cuyler testified that Eldridge asked Cuyler to work for him and further stated that he had younger gang members work for him because they do not get in as much trouble and they stay loyal. (*Id.* at 13-14) Cuyler testified that Eldridge told him that he had people killed, that he had been shot at, and that he was getting guns and

drugs from Atlanta and bringing them to Buffalo. (*Id.* at 15-16) As detailed above, Steve Martin testified that he was a member of the Montana Bridge Gang from the mid 1990's to early 2000's and that he and other members sold drugs and committed robberies on Montana Street and in the surrounding neighborhood. Dkt. No. 594, 9-10. He testified that Allen was a close friend of his, and that Allen, Eldridge and Speed were all friends. (*Id.* at 15-16) Martin testified that Allen and Speed were part of the Montana Bridge Gang, that members of the gang represented their "streets [Montana and the surrounding neighborhood] through drugs and firearms", that Montana Bridge members participated in robberies, burglaries and shootings, and that they targeted drug dealers for robberies. (*Id.* at 21, 24 33) Martin provided detailed testimony about conversations he had with Allen about robbing drug dealers in the late 1990's and early 2000's, and that when he was released from prison in 2005, Allen recruited him to participate in robberies of drug dealers with him, Eldridge and Speed. (*Id.* at 34, 64-65) Specifically, Martin testified that he was present for approximately 12 meetings between Eldridge, Allen, Speed between January and May of 2005 where they discussed robbing drug dealers, including Johnson. (*Id.*) Martin further testified that Allen told him that in the summer of 2004, Eldridge and Speed robbed Michael Ray. (*Id.* at 71-73) Martin testified that, as far as he knew, Eldridge received drugs and sold them after the robberies, and that Eldridge and Allen made at least three trips to Atlanta following the robberies. (*Id.* at 85, 119) He testified that he observed Allen and Speed represent the Bloods through tattoos and handshakes. (*Id.* at 85-89) Woodie Johnson testified that he was kidnapped at gunpoint by Eldridge, Speed and Allen, and that they stole cocaine from him. Dkt. No. 597, pgs. 39-59, 61-63. Ralph Niesman testified that he knew Eldridge, Allen and Speed for many years. Dkt. No

599, pgs. 131-134. Niesman sold drugs and was involved in the robberies of drug dealers. (*Id.* at 134, 137) Niesman testified that he met with Eldridge in June of 2005 and Eldridge told him that he was robbing people and asked Niesman if he wanted to get involved. (*Id.* at 137 -139) Frank Nash testified that he broke into two houses with Eldridge and Speed. Dkt. No. 604, pg. 127-128. Nash also testified that in 2004 he was in a car with Eldridge and Speed when Speed gave him a gun and asked him to shoot someone. (*Id.* at 125-26)

This testimony, considered in its totality, establishes that Eldridge, Allen, and Speed were members of a continuing criminal organization that obtained money and other things of value through drug distribution, robberies, intimidation and acts of violence, and that they recruited and directed others to assist in these activities. *Boyle*, 556 U.S. at 947 (the existence of an enterprise may be inferred from the pattern of racketeering acts since "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce") (internal citations omitted); *United States v. Lee*, 660 Fed. Appx. 8, 9-10 (2d Cir. 2016) (evidence that a group of about a dozen members, centralized around one street, sought to enrich members through narcotics trafficking and armed robberies, over the course of a decade, was sufficient to establish an enterprise under RICO).

Furthermore, the evidence demonstrates that one of the means and methods of the conspiracy was that its members represented themselves to associated with various gangs, including the Bloods and the Montana Bridge Gang, in order to gain power and intimidate others. In establishing the existence of an enterprise, it is irrelevant that Eldridge represented himself to be a member of the Bloods while other members

represented themselves to be members of the Montana Bridge Gang or the Bloods, or both. Indeed, there was a plethora of testimony that Eldridge acted together with Speed, Allen and others to engage in a continuing pattern of unlawful activities. Finally, the Court rejects defendant's arguments that an enterprise was not proven because there was no evidence of a hierarchical structure or management, as these are not necessary elements for the existence of a racketeering enterprise. *See Boyle*, 556 U.S. at 948 ("an association-in fact enterprise is simply a continuing unit that functions with a common purpose…[s]uch a group need not have a hierarchical structure or 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods….[t]he group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies").

### *Defendant Eldridge: Narcotics Conspiracy*

Eldridge argues that there was insufficient evidence that he participated in a narcotics conspiracy or possessed drugs with intent to distribute them, and therefore his convictions as to Count 3 (narcotics conspiracy) and the racketeering act related to narcotics conspiracy must be dismissed. The Court rejects these arguments and finds that there was more than sufficient evidence for a reasonable fact finder to conclude that defendant was guilty of narcotics conspiracy.

As stated above, Sam Cuyler testified that Eldridge told him that he obtained drugs and guns from Atlanta. This testimony was corroborated by Steve Martin's testimony that Eldridge and Allen traveled to Atlanta after robbing drug dealers, and Government exhibits which demonstrated that eight hundred thirty-two (832) phone calls were placed from Eldridge's cellular phone to Atlanta-area phone numbers between March and June

of 2005. Martin also testified that it was his understanding that Eldridge sold drugs after robbing drug dealers. Jay Renfro testified that he was a major drug dealer in Buffalo from 2001 through 2004, and that he would "move" or sell approximately ten kilograms of crack cocaine per week. Dkt. No. 592, pg. 57-58. Renfro testified that in or around 2003 he provided Eldridge with half a kilogram of crack cocaine, which was worth approximately $10,000. (*Id.* at 61-62) Renfro also testified that after he was released from jail, around March of 2005, he drove Eldridge around two or three times, and that he observed Eldridge with a gun. (*Id.* at 65-66, 67, 78-80) Frank Nash testified that he began selling crack cocaine for Eldridge in the spring of 2004 because Eldridge "did not like getting his hands dirty." Dkt. No. 604, pg. 116-117. As stated above, Timothy Jackson observed Eldridge and Allen with Speed on Montana Street when he was purchasing drugs from Speed.[4] Dalon Moss testified that in September of 2005 she met a man in a gas station parking lot and traded temporary use of her car for $20 worth of crack cocaine. Dkt No. 660, pg. 58-69. She later identified the man as Eldridge in a police line-up. (*Id.*) Finally, there was a plethora of testimony that Eldridge and co-conspirators routinely targeted drugs dealers for robberies, and that Eldridge robbed Johnson of money and two kilograms of crack cocaine.

The Court rejects defendant's arguments that his conviction should be overturned since there was insufficient evidence that he himself sold narcotics, or that he was involved in a joint venture with others to sell them. The actual distribution of narcotics is not a necessary element for conspiracy to distribute narcotics, and the evidence,

---

[4] In the supplemental affidavit in support of his motion for a new trial, Eldridge argues that Jackson was unreliable and not credible in his testimony. However, assessing witness credibility is a function reserved for the jury. *See United States v. Frampton*, 382 F.3d 213, 221 (2d Cir. 2004) ("It is well-established that the evaluation of witness credibility is a function of the jury…")

considered in its totality and with all inferences drawn in favor of the Government, demonstrates that Eldridge, Allen and others conspired together to rob drug dealers and engage in narcotics trafficking. *See United States v. Rodriguez,* 392 F.3d 539, 544 (2d Cir. 2004) ("To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."); *United States v. Anderson*, 747 F.3d 51, 61-62 (2d Cir. 2014) (intent to distribute may be inferred from the drug quantity); *United States v. Fernandez*, 636 Fed. Appx. 71 (2d Cir. 2016) (defendant's argument that the record was insufficient to demonstrate his membership in the charged conspiracy because there was no evidence that he handled or sold narcotics failed…because "even if [defendant] was not seen in personal possession of narcotics, the record shows that he led the drug operation…[and a witness identified him] as the 'boss' who 'puts up the money' for the drugs distributed by the operation"); *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997) ("a conspiracy may be established entirely by circumstantial evidence…the conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement…and the absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it").

### Defendant Eldridge:  Possession of Firearms

Eldridge argues that his conviction as to Count 4 must be dismissed because there was insufficient evidence that he possessed firearms in furtherance of drug trafficking. Here again, the Court finds that the evidence, considered in its totality and in a light most

favorable to the Government, was sufficient to sustain Eldridge's conviction as to Count 4.

As detailed previously, Jay Renfro testified that when Eldridge was released from jail, Renfro provided him with half a kilogram of crack cocaine. Renfro further testified that he drove Eldridge around Newburgh Street, an area where the enterprise was known to sell drugs, and observed that Eldridge carried a firearm on those occasions. Also during Renfro's trial testimony, the Government was permitted, pursuant to Federal Rule of Evidence 801(d)(1)(A), to introduce testimony that Renfro previously provided to the grand jury. (*Id.* at 78) Specifically, the jury heard previous testimony from Renfro that every time he drove Eldridge somewhere, Eldridge had a gun with him, and that Eldridge was "always strapped" meaning that he possessed a gun "every time, all day, every day." (*Id.* at 79) Renfro was asked if Eldridge had a gun with him when Renfro dropped him off to sell drugs, and he answered yes. (*Id.* at 80) Renfro also testified that Eldridge carried a gun "basically because he had beef with everyone or other than that, robbing people." (*Id.*) Sam Cuyler testified that Eldridge told him that he obtained guns and drugs from Atlanta, and that he had shot people and had been shot at. Steve Martin testified that guns were present in the home on Newburgh Street when he, Allen, Speed and Eldridge discussed robbing drug dealers, and Woodie Johnson testified that he was robbed at gunpoint by a group of individuals which included Eldridge. Frank Nash testified that he broke into two homes and stole drugs with Speed and Eldridge, and that he was armed at the time. Dkt. No. 604, pgs. 128-132. Timothy Jackson testified that Eldridge and Allen were present when he purchased crack cocaine from Speed, and that Allen was armed. Indeed, there was also testimony by a number of witnesses that members of the

enterprise carried guns for protection and used firearms in the course of carrying out various unlawful activities, including drug trafficking and the robbery of drug dealers. *See United States v. Estrada*, 430 F.3d 606, 613 (2d Cir. 2005) (recognizing that firearms are tools of the drug trade); *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) ("the ultimate question is whether the firearm "afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking…[and] a drug dealer may be punished under §924(c)(1)(A) where the charged weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself.") (internal citations omitted); *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005) ("the test is whether a reasonable jury could, on the evidence presented at trial, find beyond a reasonable doubt that possession of a firearm facilitated a drug trafficking crime").

### *Defendant Eldridge:  Attempted Robbery at 87 Girard Street*

Eldridge argues that there was insufficient evidence for a reasonable fact finder to conclude that he committed the racketeering act related to an attempted robbery at 87 Girard Street on March 24, 2004.  Defendant emphasizes that the perpetrators of the robbery were masked and the victims could not properly identify them, and that the general description of the perpetrator as an average-sized black male with glasses was insufficient to link him to the crime.  Defendant further argues that even though his DNA was found on a cigar butt at the scene, there was no evidence that the perpetrator of the robbery was smoking a cigar.

Alice Collins, a victim of the robbery, testified that in March of 2004 she rented the lower apartment at 87 Girard Street in Buffalo with her significant other, Rolla Hackett.  Dkt. No. 659,168-169, 171.  She testified that her landlord, Orlando Davis, lived in the

upper apartment. (*Id.* at 174-175) She testified that, at that time, she and her friends were regular crack cocaine users and that they would often purchase crack cocaine from Davis. (*Id.*) She further testified that people routinely came and went from the upper apartment, which she assumed was related to buying drugs. (*Id.*) Collins testified that on March 24, 2004, she left the apartment to do some shopping and returned to find Hackett and three other acquaintances tied up with duct tape. (*Id.* at 176-178) Collins testified that two black men, one light and shorter and the other dark and taller, had guns pointed at them. (*Id.* at 179-180) Collins testified that the men told her to get on the floor, at which time the front door made a cracking sound, and the men panicked and ran. (*Id.* at 182) There was also testimony from Davis that the door at the rear of Collins' apartment leads to a staircase that accesses the upper apartment. Dkt. No. 595, pg. 74, 76-77. He further testified that when the police came to investigate the robbery, he was arrested for drug paraphernalia, including "cocaine bags on the table, reefer bags on the table and some residue." (*Id.*) Davis also testified that he was presently incarcerated for possessing a large amount of cocaine that he intended to distribute. *(Id.* at 72) Most significantly, there was testimony that a partially smoked cigar butt was recovered from the scene of the robbery and submitted for a DNA analysis. A sample of Eldridge's DNA was compared with the DNA on the cigar, and it was found to be a perfect match.

Here, considering the evidence in its totality and drawing all reasonable inferences in favor of the Government, a reasonable fact finder could conclude that Eldridge was guilty of attempted robbery at 87 Girard Street on March 24, 2004. Indeed, Collins' description of the perpetrators generally matched that of Eldridge and Allen. The testimony indicated that a drug dealer lived upstairs from Collins and it was reasonable

for the jury to infer that he was the target of the robbery, which is consistent with evidence of other robberies planned and/or executed by Eldridge and Allen in this case. Finally, the discovery of Eldridge's DNA on a cigar butt in the apartment on the day of the incident, when there was no evidence that Eldridge had ever been to the apartment before or knew any of the individuals that lived there, is highly incriminating. *See United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cir. 1992) ("Matters of choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and we are not entitled to second-guess the jury's assessments."); *United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993) (in examining the sufficiency of the evidence, a court should not analyze pieces of evidence in isolation, but rather must consider the evidence in its totality); *United States v. Irving*, 452 F.3d 110 (2d. Cir. 2006) ("A jury may convict on circumstantial evidence alone."); *United States v. Eppolito*, 543 F.3d 25 (2d. Cir. 2008) (viewing the evidence in the light most favorable to the government means "crediting every inference that the jury might have drawn in favor of the government" and "recognizing that the governments evidence need not exclude every other possible hypothesis.") (internal citations omitted).

The Court also rejects defendant's arguments that in order to convict as to the attempted robbery, the jury must have relied on inadmissible hearsay. During the Government's opening statement, the prosecutor indicated that the jury would hear evidence that the perpetrator was smoking a cigar at the time of robbery. During the trial, the Government attempted to introduce testimony to this effect through the excited utterance exception to the hearsay rule. However, the Court ultimately sustained defendant's objections to the testimony and found it to be inadmissible hearsay. Indeed,

the jury was instructed a number of times during the trial that opening statements, and the lawyers' statements in general, are not evidence. There is no reason to believe the jury did not listen and follow this instruction. *United States v. Sparano*, 422 F.2d 1095 (2d Cir. 1970) ("As far as the opening statement was concerned, both counsel in argument and the court in its charge emphasized that the statement was not evidence and not be taken as evidence. This instruction is one which the jury could understand and follow and it is assumed they did so."); *Herring v. Meachum*, 11 F.3d 374, 378 (2d Cir. 1993) (the court must presume the jury follows instructions, unless there is an overwhelming probability that they were unable to).

### *Defendant Eldridge: Kidnapping and Robbery of Woodie Johnson*

Eldridge contends that there was insufficient evidence that he kidnapped and robbed Woodie Johnson, and therefore his convictions as to Count 5 (kidnapping in aid of racketeering), Count 6 (Hobbs Act robbery) and Count 7 (use of a firearm in furtherance of a crime of violence), as well as the related racketeering acts, should be dismissed. Specifically, defendant argues that there was insufficient evidence of an enterprise or that he kidnapped Johnson to further his position in it. Defendant further contends that because the jury hung as to defendant Allen with respect to Count 5 (kidnapping in aid of racketeering) and Count 7 (use of a firearm in furtherance of a crime of violence), Eldridge should not have been convicted of those counts since no one was found to have aided and abetted him. Finally, Eldridge argues that the testimony about the kidnapping and the robbery was inconsistent and not credible. The Court rejects each of these arguments in turn.

As explained in detail above, there was sufficient evidence presented during the trial that a racketeering enterprise existed, and that Eldridge was a member of the enterprise. Further, in *United States v. Pimentel*, the Second Circuit explained that in establishing that a defendant committed a violent crime in aid of racketeering, the "Government is not required to prove that maintaining or increasing [a defendant's] position in the RICO enterprise was the defendant's sole or principal motive…[r]ather…the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." 346 F.3d 285, 295 (2d Cir. 2003). This requirement was satisfied here through testimony regarding the nature of the kidnapping and the manner in which it was carried out. Further, the Government introduced jail calls where Eldridge made statements such as: "The way I gotta respond to certain things in Buffalo…I don't have to respond when I'm somewhere else because there are no expectations of me…"; "I be around a lot of criminals and all that and I am the one who is looked up to"; "I ain't just being the average individual amongst the whole bunch." This evidence, considered in its totality, was sufficient proof for a reasonable juror to conclude that Eldridge committed the kidnapping in furtherance of his membership in the enterprise.

Eldridge's contention that his convictions on Counts 5 and 7 cannot stand because the jury hung as to Allen's guilt on those counts is essentially a claim that the verdicts are inconsistent. The Second Circuit has routinely held that an inconsistent verdict is not a valid basis to overturn a conviction. *See Harris v. Rivera*, 454 U.S. 339, 345 (1981) (internal citations omitted) ("Inconsistency in a verdict is not a reason for setting it

aside..[w]e have so held with respect to inconsistency between verdicts on separate charges against one defendant…and also with respect to verdicts to treat codefendants in a joint trial inconsistently.")

Finally, considering the evidence in its totality and in the light most favorable to the Government, there was more than sufficient evidence for the jury to conclude that Eldridge conspired to rob Johnson, kidnapped Johnson in aid of racketeering and used a firearm in furtherance of the robbery and kidnapping.  Steve Martin provided detailed testimony about the planning of the robbery by Eldridge, Allen and Speed and testified that weapons were present during the meeting.  Johnson's testimony regarding the manner in which he was robbed at gunpoint corroborated Allen's testimony regarding the manner in which Eldridge and others planned to carry out the crime.  Indeed, as explained in detail above, any inconsistencies in the testimony or witness credibility issues were for the jury to weigh and determine.  Finally, Johnson testified that when he and Eldridge were later incarcerated together, Eldridge approached Johnson, introduced himself, and admitted that he had committed the kidnapping and robbery.

### *Circumstantial Evidence Charge*

Eldridge argues that because some of the counts and racketeering acts were based on circumstantial evidence, the Court erred in refusing to give a circumstantial evidence charge requested by the defense.  The proposed charge read, in part, that "[w]here more than one inference may logically flow from the circumstantial evidence…the jury must remember that each element of the offense must be established…beyond a reasonable doubt…[i]f the evidence supports an inference of guilt and an inference of innocence, the jury must give the defendant the benefit of the doubt."

*See* Dkt. No. 513, pg. 4.  This is a charge commonly requested under New York State criminal law.  *See People v. Sanchez*, 61 N.Y.2d 1022, 1024 (1989) (if evidence of a defendant's guilt is exclusively circumstantial, a jury must be instructed to view the evidence with particular care).  However, there is no federal constitutional right to a circumstantial evidence jury instruction, and, even if this right existed, this is not a case which rested entirely on circumstantial evidence.  *See Martinez v. Reynolds*, 888 F. Supp. 459, 464 (EDNY 1995).  Here, the Court instructed the jury, on multiple occasions, that the Government must prove each element of each offense, as to each defendant, beyond a reasonable doubt in order to support a finding of guilty.  The Court finds no error in the refusal to give the circumstantial evidence charged requested.  *See United States v. Ross*, 14-2498, 2017 U.S. App. LEXIS 9003 (2d Cir. May 24, 2017) (where a district court instructed the jury that the government bore the burden of proving each element of the four charges beyond a reasonable doubt…it did not err in declining to give the jury the circumstantial evidence charge).

For all of these reasons, the Court denies defendant Eldridge and defendant Allen's requests, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for a dismissal of their counts of convictions or, in the alternative, a new trial.

### *Rule 33*

Rule 33(a) provides that "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  *See* Fed. R. Crim. P. 33(a).  Here, defendants Allen and Eldridge argue that they are entitled to a new trial because they were denied a fair and public trial.

*Denial of Right to Public Trial*

The Government delivered its opening statement on Friday, January 15, 2016. On Monday, January 18, 2016, defendants made a motion for a mistrial. The basis of the motion, in part, was that following opening statements and the luncheon recess on January 15, government agents asked some of defendants' friends and family members, who were attending the trial as spectators, to produce identification and to provide their names, birth dates and addresses when they entered the courtroom. Defendants also stated that agents "confronted" a spectator who was taking notes. On January 19, 2016, at the conclusion of the trial testimony that day and outside the presence of the jury, the Court heard argument as to the mistrial motion. (Dkt. No. 659, pgs. 217-223) At that time, defense counsel discussed the agents' behavior and stated that the agents informed the spectators that the Court had directed them to ask for identification. (*Id.*) The Court then stated that it had made no such directive, and that it was unaware that this conduct had occurred. (*Id.*)

The Government responded, both during argument before the Court and in writing, that the request for identification was in response to a specific instance of potential witness intimidation or threats that occurred that day. The Government proffered that during its opening statement, some spectators appeared to be taking notes and leaving the courtroom. Shortly thereafter, the Government received reports of witness intimidation. In fact, the Government indicated the between the start of the trial and the conclusion of opening statements, they had to relocate a witness who had been threatened twice during that period of time. (*Id.* at 215) As a result, the Government made an effort to determine, at that time, who the spectators were. The

Government also employed agents in plain clothes to ascertain which spectators were involved in notetaking.  The Government indicates that no individuals were asked for identification when the jury was present or when court was in-session, no one was prevented from entering the courthouse or courtroom, no one was prevented from taking notes, and no notes were actually confiscated.

The motion for a mistrial was denied orally by the Court on January 19, 2016, and then in a written decision on February 2, 2016.  (Dkt. No. 555)  A review of the record indicates that following the oral argument on January 19, 2016, the Court was not made aware of any further incidents wherein spectators were asked for identification before entering the courtroom.  Defendants Allen and Eldridge now renew their previous arguments and contend that they are entitled to a new trial pursuant to Rule 33 of Federal Rules of Criminal Procedure because the agents' conduct in requesting that spectators provide identification before entering the courtroom deprived them of a public trial.

The Sixth Amendment provides, *inter alia*, that "the accused shall enjoy the right to a…public trial."  U.S. Const. amend. VI.  The Second Circuit has noted a "special concern for assuring the attendance of family members of the accused."  *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994); *Guzman v. Scully*, 80 F.3d 772, 776 (2d Cir. 1996) ("The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly.")  However, a criminal defendant's right to a public trial "may give way in certain cases to other rights or interests."  *See Waller v. Georgia*, 467 U.S. 39, 45 (1984).  In *Waller*, the Supreme Court established a four-prong test used to determine when a defendant's

Sixth Amendment right is violated by the closure of the courtroom. *Id.* Specifically, the Court found that closure of a courtroom does not rise to the level of a Sixth Amendment violation if: "(1) closing the hearing would advance an overriding interest that is likely to be prejudiced; (2) the closure is no broader than necessary to protect that interest; (3) the trial court considers reasonable alternatives to closing the proceeding; and (4) the trial court makes findings adequate to support the closure." *Id.* The Second Circuit has held that where a partial closure occurs, such as the enforcement of a requirement that visitors or spectators show identification, the first *Waller* factor is relaxed, requiring only a "substantial reason" rather than an "overriding interest" justifying the closure. *United States v. Smith*, 426 F.3d 567 (2d Cir. 2005) (defendant's "Sixth Amendment right to a public trial was not violated by the requirement that court visitors show photo identification because the security measures effected at most a partial closure of [the] trial that satisfied that four-part test articulated in *Waller v. Georgia*").

Here, there was a substantial interest advanced in requesting spectators to provide identification on January 15, 2016, namely to prevent witness tampering. During the Government's opening statement, the prosecutor referred to several witnesses who would be testifying on behalf of the Government. Since a protective order had previously been in place, this was the first time that these witness names were publically revealed. The Government indicated that immediately following opening statements, it received information that at least one witness mentioned during the opening had been threatened or intimidated. Since defendants were incarcerated, a protective order was in place with regard to the witness list, and there had been no media reports containing names of witnesses at that time, an inference could logically

have been drawn that a spectator to the trial was either directly involved in the threat or had disclosed information which resulted in the threat.  Indeed, when the courtroom closure is narrow, a court is not required to "demand compelling evidence" that there is a positive correlation between the partial closure and the interest asserted.  *Smith*, 426 F.3d 573 (internal citations omitted) ("the district court's 'common sense' conclusion that 'someone who is forced to identify themselves is less likely to pose a threat than someone who is allowed to walk into the building without any at all' satisfies this undemanding inquiry").  Here, a requirement that an individual present identification to law enforcement made it less likely that they would then be involved with witness tampering or intimidation.  In addition, a list of the spectators present during the trial would aid law enforcement in the event that further investigation needed to be conducted.  Thus, the Court finds a direct connection between the partial closure, in the form of the identification request that day, and the Government's interest in preventing witness tampering.

As to the second prong, the Court finds that the partial closure was not broader than necessary to protect the asserted interest.  Not only was the closure itself very narrow and only affected those who could not, or would not, produce identification, but it only occurred for a brief period of time immediately after the Government received reports of witness identification.[5]  The third prong requires a trial court to consider reasonable alternatives to closing the proceedings.  *See Waller*, 467 U.S. at 48.  Here,

---

[5] The Court notes that there is no evidence that any spectator was permanently excluded from the trial. Instead, defendants claim that some spectators chose not to return because they did not want to provide identification.  While defendants state that Eldridge's brother, Julius Jones, was excluded from the courtroom because he did not stand when the jury entered, there is no evidence that this was a permanent bar as to Mr. Jones' ability to attend the proceedings.

the Court did not have the opportunity to consider reasonable alternatives because the request for identification was undertaken for a brief period of time only and without the Court's knowledge or prior approval. However, the Court notes that the request occurred only immediately after and in specific response to a report that a witness had been threatened, and was undertaken to prevent any witness interference or intimidation. In light of the brief period during which the request for identification occurred and the surrounding circumstances, the Court finds that the requests were narrowly tailored, reasonable and appropriate.

Finally, the fourth prong requires that the trial court "make findings adequate to support the closure." *Waller*, 467 U.S. at 48. These findings must ordinarily support "the particular courtroom closing ordered by the trial judge." *Bowden v. Keane*, 237 F.3d 125, 129-30 (2d Cir. 2001). In *United States v. Smith*, the Second Circuit recognized the fourth prong may be met in circumstances where the Court has not ordered the partial closure and has not made particularized findings before the partial closure is carried out. 426 F.3d at 574. In *Smith*, the Second Circuit held that a requirement that visitors and spectators produce identification before entering the courthouse was a valid partial closing that did not violate defendant's Sixth Amendment rights, in part because "the requirement of particularized findings is unjustified, since the post-September 11th security measures were adopted by the Marshals Service and DHS to address a generalized threat." *Id*. The Second Circuit went on to explain that:

> When a judge, in the relative calm of chambers, issues [a closure order], for example, the requirement of particularized findings obtains. In that context, findings are a necessary safeguard against arbitrary judicial abridgment of the constitutional right. But when the decision is made by an administrative or law-enforcement officer in the lobby of a courthouse,

adherence to what in those circumstances would be the anomalous formality of particularized findings cannot reasonably be expected.

*Id.*; *quoting Huminski v. Corsones*, 396 F.3d 53, 86-87 (2d Cir. 2005). Here, the Government and law enforcement made a determination, in light of the information they were immediately presented with, to ask for spectators' identification in response to a report of witness intimidation. The Court concludes that, in consideration of all surrounding factors at that time, it was appropriate for agents to request identification and that the circumstances did reasonably lend themselves to particularized findings by the Court. For all of these reasons, the Court concludes that defendants' rights to a public trial were not violated.

With respect to the agent's request to review spectator notes, this action did not implicate defendants' Sixth Amendment rights. No individual was precluded from taking notes, and no notes were confiscated from any spectator. Because the agent's review of spectator notes did not constitute a closure or partial closure of the courtroom, the defendants' rights to a public trial were not violated in this regard.

### *Denial of Right to Fair Trial*

Prior to the start of the trial, the Court received a recommendation from the United States Marshal's Service that, as a result of defendants' prior history and the nature of the crimes charged, defendants should remain in leg shackles during the course of the trial. In anticipation of this, the Court erected a curtain, which was approximately three feet high and attached to stationary rods. The curtain concealed defendants' leg shackles from the jury. The curtain ran down the middle of the courtroom, from the Judge's bench in front of the courtroom to approximately three feet from the spectator gallery. The curtain separated defendants and their counsel on one

side from the Government attorneys and the jury on the other.  The curtain then continued behind defense tables to the wall furthest from the jury box, separating defendants from the spectator gallery.

On January 12, 2016, prior to the start of the trial, defendants moved to have their leg shackles removed for the duration of the trial.  On January 13, 2016, the Court granted defendants' request to remain unshackled.  This request was granted contrary to the United States Marshal's recommendation that defendants remain in leg shackles over the course of the trial.  At that time, the Court informed defendants that if they were at all disruptive or did not follow directions of the Marshal's, the shackles would be placed back on.  Jury selection occurred on January 13 and 14, 2016.  Defendants were not in leg shackles but the curtain remained in place.  Sometime during the first day of jury selection, defense counsel requested that the curtain be removed.  The Court denied this request and left the curtain in place throughout the trial.  The Court reasoned that if for some reason a defendant needed to be placed back in leg shackles, it would look suspicious if the curtain suddenly appeared.

Defendants argue that the placement of a hip-height, black curtain down the center of the courtroom violated their right to a fair trial because the curtain, combined with the presence of many marshals and the fact that Juror 1 asked the Court if defendants had his personal information, indicates that jurors perceived defendants to be violent.  Defendants also raised this issue in their motion for a mistrial, which was denied orally by the Court on January 19, 2016 and then in a written decision on February 2, 2016.  (Dkt. No. 555)

The Second Circuit has held that "a trial judge may order physical restraints on a party only when the court finds those restraints to be necessary to maintain safety or security; but the court must take steps to minimize the prejudice resulting from the presence of the restraints." *Davidson v. Riley*, 44 F.3d 1118, 1122-23 (2d Cir. 1995). A court may not "delegate this discretion to another party, including the Bureau of Prisons or the United States Marshals, because the court must 'consider all the evidence and ultimately make the decision [for itself]'." *Id.* at 1123 (internal citations omitted); *see also Hameed v. Mann*, 57 F.3d 217, 222 (2d Cir. 1995) (the decision to impose any physical restraints must be made by the trial judge and must be on the record). The Second Circuit has further held that where a district court "finds that shackles are necessary for the safety of the defendant or any other persons in the courtroom, the Court must ensure that the restraints are no greater than necessary to ensure safety during trial, and the Court must take steps to minimize any prejudice to the defendant from being tried in physical restraints." *United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013).

Here, the Court made an independent finding, on the record and after hearing from all parties, that defendants would be permitted to remain unshackled for the trial contingent on their continued good behavior and total cooperation with the United States Marshal's. This request was granted in spite of the United States Marshal's recommendation to the contrary. However, the Court warned defendants and their counsel that any noncompliance or disruption by defendants would result in reinstatement of the leg shackles. Because the Court specifically accounted for the possibility that one or all of the defendants could be placed back in leg shackles if they

were noncompliant or disruptive, the Court left the curtain in place. The curtain was necessary to hide the leg shackles from the view of the jurors, and the sudden appearance of a curtain part-way through the trial would likely have caused speculation or suspicion by jurors. In contrast, the presence of the curtain from the beginning of the trial through the end would have caused much less suspicion or speculation in that it would likely appear to jurors as a normal feature of the courtroom.

The Court rejects defendants' argument that the curtain is an "unconstitutional restraint" which implies that defendants are dangerous and draws immediate attention to their side of the courtroom. At the time of the trial, defendant Allen was currently serving a twenty-five year sentence following a state court conviction for a murder unrelated to this case and two additional, consecutive five year sentences for state court burglary convictions, defendant Eldridge had prior convictions for manslaughter and robbery, among others, and defendant Rose had been flagged by the United States Marshal's as a flight risk. All three defendants were charged with violent crimes, including murder, and all faced life sentences if convicted. There were reports that Government witnesses have been threatened, and a protective order as to discovery materials and the witness list was in place. It was certainly not unforeseeable that one or more of the defendants would need to be placed in leg shackles at some point during the trial. The use of the curtain throughout the trial ensured that no undue attention would be paid to its presence if circumstances changed and leg shackles were needed.

Further, given defendants' histories and the totality of the circumstances presented, including the Court's need to eliminate prejudice by accounting for the fact that leg shackles may need to be reinstated, the use of a curtain as a divide in the

courtroom did not deprive defendants of a fair trial. The Supreme Court has acknowledged that while "'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial'...[t]his does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down." *Holbrook v. Flynn*, 475 U.S. 560 (1986) (internal citations omitted). The Supreme Court went on to explain that "recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from the trial procedure every reminder that the state has chosen to marshal its resources against a defendant to punish him for criminal conduct." *Id.*

For all of these reasons, the Court denies Allen and Eldridge's motions for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

## CONCLUSION

For the foregoing reasons, defendant Kevin Allen and defendant Thamud Eldridge's motions for a judgment of acquittal and a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, are denied in their entirety. Counsel shall appear before the Court on Wednesday, August 30, 2017 at 10:00 a.m. for a status conference and to set dates for defendants' sentencings.

**SO ORDERED.**

Dated:  August 28, 2017
        Buffalo, New York

                            __*s/Richard J. Arcara*_____
                            RICHARD J. ARCARA
                            United States District Judge