UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━━━━━━━━━━

UNITED STATES OF AMERICA,

                              Plaintiff,          **DECISION AND ORDER**
        v.                                             9-CR-329-A

THAMUD ELDRIDGE,

                              Defendant.

━━━━━━━━━━━━━━━━━━━━━━━━━

        The Second Circuit vacated a single count of Defendant Thamud Eldridge's multi-

part conviction on direct appeal, and otherwise affirmed his remaining counts of

conviction, which were remanded to this Court for resentencing.  As it did at the time of

Eldridge's original sentencing (*see* Dkt. No. 757), the Government asks (*see* Dkt. Nos.

958, 961, 993) that the Court resentence Eldridge to a life sentence on the basis that a

preponderance of the evidence at Eldridge's trial established that he committed or was

involved in the commission of two murders, or in the alternative, that the Court

resentence Eldridge to a 600-month or 50-year aggregate sentence, which was imposed at

the original sentencing.  Eldridge opposes this request (*see* Dkt. No. 990) and has moved

this Court (Dkt. No. 1009) to schedule a purely ministerial sentencing, arguing that *de

novo* resentencing is neither required nor requested and the Court should instead simply

issue an amended judgment of a 25-year aggregate sentence.[1]

---

[1] The defense was originally requesting that Eldridge be resentenced to an aggregate 20-year
sentence.  *See* Dkt. No. 990, p. 12.

For the reasons stated herein, the Court denies Eldridge's motion to schedule a purely ministerial sentencing. In addition, as the Court discusses in detail below, having presided over the trial in this case and based upon its recollection of the trial, its review of the trial transcripts and the exhibits introduced into evidence, and its assessment of the arguments made by both the Government and Eldridge, the Court finds by a preponderance of the evidence that Eldridge personally committed the murder of Sam Jones, Jr. (a/k/a "Smokey," hereinafter "Smokey"), and that such murder is properly included as part of Eldridge's relevant conduct to his violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act. Because the total offense level (after all adjustments) under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is level 43, regardless of whether this Court makes any additional findings regarding the murder of Thedrus Laster (a/k/a "Flap," hereinafter "Flap"), the Court need not analyze Eldridge's role in Flap's murder and declines to do so.

## BACKGROUND AND PROCEDURAL HISTORY

### I.    The Superseding Indictment

On June 20, 2012, Eldridge was charged in a 17-count Superseding Indictment (Dkt. No. 164), along with three co-defendants, Kevin Allen, Galen Rose, and Kashika Speed, with drug and firearms offenses, as well as violations of the RICO Act. The Superseding Indictment alleged that from in or about 2003 continuing until in or about December 2005, Eldridge, Allen, and Speed were members and associates of a criminal organization that engaged in the distribution of cocaine, cocaine base, marijuana, and heroin, and that they also committed acts of violence in furtherance of their drug

trafficking enterprise, including murder, robbery, and extortion.[2]  The Superseding

Indictment alleged that defendants targeted and robbed drug dealers of money and

controlled substances, and that they used firearms, extortion, and violence to expand their

territory and power.  Eldridge was charged in Counts 1 through 7 and 10 through 17 of

the Superseding Indictment.

Specifically, Eldridge was charged with racketeering (Count 1, which alleged six

predicate racketeering acts ["RAs"] against Eldridge); racketeering conspiracy (Count 2,

which alleged six overt acts identical to the RAs in Count 1); narcotics conspiracy (Count

3); possession of firearms in furtherance of the drug trafficking crime described in Count

3 (Count 4); kidnapping in aid of racketeering (Count 5); Hobbs Act robbery (Count 6);

and possessing and brandishing a firearm in furtherance of the crimes of violence charged

in Counts 5 and 6 (Count 7).  Counts 5, 6, and 7 arose from the kidnapping and armed

robbery of Woodie Johnson, a cocaine dealer, on February 23, 2005.

Eldridge was also charged with murder in aid of racketeering (Count 10); Hobbs

Act robbery (Count 11); and discharge of a firearm causing death in furtherance of the

crimes of violence charged in Counts 10 and 11 (Count 12).  Counts 10, 11, and 12,

related to the robbery and death of Flap, a marijuana dealer, on or about April 2, 2005.

Eldridge was further charged with murder in aid of racketeering (Count 13); Hobbs Act

robbery (Count 14); and discharge of a firearm causing death in furtherance of the crimes

---

[2] Co-defendant Rose was not charged in the RICO counts.

of violence charged in Counts 13 and 14 (Count 15), relative to the robbery and death of Smokey, a cocaine dealer, on April 6, 2005—days after Flap's murder.

Eldridge was further charged with possession and discharge of a firearm in furtherance of the drug trafficking crime described in Count 3 (Count 16) and felon in possession of a firearm (Count 17), both counts which arose from an incident during which Eldridge allegedly fired shots at a City of Buffalo Police Officer on September 21, 2005. On January 7, 2016, this Court issued a Decision and Order (Dkt. No. 530) severing Counts 16 and 17, as the lead prosecutor had potentially relevant and necessary testimony with respect to those two counts, which could possibly lead to his disqualification. Thus, trial proceeded on the remaining counts.

## II.    The Trial and Jury Verdict, and Post-Trial Proceedings

On January 13, 2016, the jury trial of Eldridge, Allen, and Rose commenced on Counts 1 through 15 of the Superseding Indictment.[3] *See* Dkt. No. 606 (Redacted Superseding Indictment). Fifty-two witnesses testified and over 200 exhibits were introduced into evidence.

At the conclusion of the five-and-one-half-week trial, on February 24, 2016, the jury rendered its verdict (Dkt. No. 617) finding Eldridge guilty of racketeering (Count 1), specifically finding that Eldridge committed conspiracy to distribute controlled substances (RA 1); attempted robbery at 87 Girard Street (RA 2); and robbery,

---

[3] Speed entered into a plea agreement with the Government on June 16, 2014, and was sentenced by this Court on October 2, 2014, to 192 months' incarceration. He did not testify at the trial.

kidnapping, and conspiracy to rob and kidnap Johnson (RA 3). The jury found Eldridge not guilty of the racketeering acts involving the robbery of Larry Kemp (RA 4) and the intentional murder of Flap (RA 5(B)). The jury was unable to reach a verdict on the racketeering acts involving the robbery of Flap (RA 5(C)) and the felony murder of Flap (RA 5 (A)) and was likewise unable to reach a verdict on any of the racketeering acts involving the robbery and murder of Smokey (RA 6).

As to the remaining counts, the jury found Eldridge guilty of racketeering conspiracy (Count 2),[4] narcotics conspiracy (Count 3), possession of firearms in furtherance of drug trafficking (Count 4), and the kidnapping and robbery of Johnson at gunpoint (Counts 5, 6, and 7).[5] The jury found Eldridge not guilty of murder in aid of racketeering, as to Flap (Count 10), and was unable to reach a verdict on the robbery of Flap and the use of a firearm causing his death (Counts 11 and 12). The jury was unable to reach a verdict as to murder of Smokey in aid of racketeering (Count 13) and was also unable to reach a verdict on the robbery of Smokey and the use of a firearm causing his death (Counts 14 and 15).

Following the verdict, the Government filed a motion (Dkt. No. 607) asking the Court to defer retrial of the unresolved/hung counts, that is, Counts 11 through 15, until the appeal of the counts of conviction was resolved. The Government represented that "[b]ased upon the lengthy guideline prison sentences and mandatory minimum sentences

---

[4] The jury made findings on Overt Acts 1-6, identical to its findings on RAs 1-6 in Count 1.

[5] On Count 7, charging 18 U.S.C. § 924(c)(1)(A)(ii), the jury found that Eldridge brandished the firearm.

associated [with] the counts of conviction," the Government did not intend to retry the unresolved counts "if the counts of conviction are affirmed on appeal." The parties grappled with the issue of whether retrial of the hung counts should be deferred, when the Court should try severed Counts 16 and 17, and whether the severed counts should be tried together with the hung counts. During this timeframe, Eldridge's trial counsel moved to withdraw (Dkt. No. 620) from the case, and his motion was granted and new counsel appointed to represent Eldridge on the post-verdict motions as well as the Government's motion to defer retrial. On October 14, 2016, the Court granted the Government's motion to defer retrial (Dkt. No. 677 [Decision and Order]) and determined that the hung counts would be tried together with the severed counts.

On August 28, 2017, the Court issued a Decision and Order (Dkt. No. 710) denying Eldridge's and Allen's post-trial motions.[6]

## III.    **Eldridge's Sentencing and Direct Appeal**

In advance of Eldridge's sentencing, the Government indicated to the Court that it was advocating for "the maximum term of imprisonment authorized by law," that is, life. Dkt. No. 757, p. 3. The Government's position was that while the jury was unable to reach a verdict with respect to the Smokey murder and found Eldridge not guilty as to the

---

[6] By written stipulation entered on June 29, 2016 (Dkt. No. 645), in exchange for Rose agreeing to not appeal the jury's verdict convicting him of Counts 8 and 9 (the marijuana possession/distribution and conspiracy counts), that the relevant conduct established the basis for an aggregate sentence of 10 years' imprisonment, and not to appeal an aggregate sentence of 10 years' imprisonment, the Government agreed to dismiss Counts 11 and 12 (the counts related to the murder of Flap), which the jury was unable to reach a verdict on.

Flap homicide, the Government had established Eldridge's guilt for both murders by a preponderance of the evidence.

On September 10, 2018, this Court sentenced Eldridge to a total term of 600 months' imprisonment: 240 months as to each of Counts 1, 2, 5, and 6, and 120 months as to Count 3, all to run concurrently with each other; 60 months on Count 4, to run consecutive to all other counts; and 300 months on Count 7, to run consecutive to all other counts. Dkt. No. 835 (Sentencing Tr.), p. 49. The Court noted that the Guidelines range on Count 5 would be either life should the Court accept the calculations of the PSR and the Government, or 262 to 327 months should the Court accept Eldridge's calculations. Dkt. No. 835, p. 20. However, the Court found the exception to making a precise calculation of the applicable range as provided in *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005), applied. Dkt. No. 835, pp. 20-21. The Court explained:

> Taking into account the total sentence to be imposed, the Court recognizes that regardless of the sentence that it will impose on Counts 1, 2, 3, 5 and 6, the Court must, by law, impose an additional 60-month sentence as to Count 4 and an additional 300-month sentence as to Count 7. These sentences must run consecutively to each other and to all other counts of conviction.
>
> In light of the aggregate sentence that will be imposed here and after considering all the factors set forth in 3553(a), together with defendant's history, characteristics and crimes of conviction, the Court finds that it's reasonable, sufficient and not greater than necessary to impose a non-guideline sentence on Count 5 of 240 months. In light of this determination, the Court finds that it is not necessary for it to make a determination as to which guideline range applies to Count 5. Thus, it is not necessary for the Court to make a finding as to whether it's been proven, by a preponderance of

7

the evidence, that defendant conspired to rob and murder
[Flap] and [Smokey].

Dkt. No. 835, pp. 20-21.

On September 20, 2018, Eldridge filed a notice of appeal (Dkt. No. 792). While the appeal was ongoing, counsel who represented Eldridge at sentencing was reappointed, and the parties provided periodic status reports on the progress of Eldridge's appeal. At a status conference on July 1, 2020, at which Eldridge demanded a trial date on the hung counts and dismissal of the severed counts on speedy trial grounds, the Government indicated that in the interest of judicial economy, the parties should continue to await a decision from the Second Circuit before proceeding with another trial. The Government also stated that should the Circuit affirm the convictions, it would move to dismiss the remaining counts of the Superseding Indictment, that is, both the hung counts and the severed counts. Should the Circuit not affirm the convictions, however, the Government intended to rejoin the hung and severed counts for one trial.

In an opinion and accompanying summary order (Dkt. No. 908) dated June 22, 2021, the Second Circuit affirmed Eldridge's convictions and sentences.[7] At a status conference held on June 25, 2021, the parties reported that the Second Circuit had rejected Eldridge's appeal as to the trial counts of conviction. On July 27, 2021, the Court entered an order of dismissal (Dkt. No. 905) as to the hung and severed counts, *i.e.*, Counts 11 through 17. At a status conference two days later, the parties reported that

---

[7] The Mandate was later issued on September 2, 2021.

based on the order of dismissal, there were "no unresolved or pending counts in this case."  CM/ECF Minute Entry, 07/29/2021.

Eldridge filed a petition for a writ of certiorari.  In a certified order (Dkt. No. 922) issued on July 27, 2022, the Supreme Court vacated the judgment and remanded the case for further consideration in light of its recent decision in *United States v. Taylor*, 596 U.S. 845 (2022), with respect to Eldridge's conviction on Count 7, for possessing and brandishing a firearm in furtherance of a crime of violence.  On April 20, 2023, the Second Circuit issued a mandate (Dkt. No. 939) vacating Eldridge's conviction on Count 7, concluding "none of the three possible predicates" for that conviction "is a crime of violence under § 924(c)(3)(A)[.]"[8]  The Circuit affirmed Eldridge's jury trial convictions on Counts 1 through 6, and provided the following instructions to this Court: "we VACATE Eldridge's conviction on Count Seven and REMAND to the district court for resentencing on all of Eldridge's remaining counts of conviction."  Dkt. No. 939, p. 11.

---

[8] As previously stated, the crimes of violence as referenced in Count 7 were those charged in Count 5, kidnapping in aid of racketeering, based on kidnapping in the second degree under New York Penal Law § 135.20; and in Count 6, Hobbs Act robbery charged under two theories, conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery.  The verdict form did not ask the jury to identify on which predicate(s) it was basing its guilty verdict for Count 7.

The Second Circuit agreed with Eldridge's contention that neither conspiracy to commit Hobbs Act robbery nor attempted Hobbs Act robbery qualified as a crime of violence under § 924(c)(3)(A) and therefore Count 6 could not serve as a predicate for Eldridge's Count 7 conviction under § 924(c)(1)(A)(ii).  *See Taylor*, 596 U.S. 845 (attempted Hobbs Act robbery); *see also United States v. Davis*, 588 U.S. 445 (2019), and the Second Circuit's subsequent decision in *United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019) (Hobbs Act conspiracy).  Additionally, the Government conceded, and the Second Circuit--employing the modified categorical approach--held that kidnapping in the second degree under New York Penal Law § 135.20 is not categorically a crime of violence pursuant to § 924(c)(3)(A), and therefore Eldridge's conviction on Count 5 could not serve as a predicate under Count 7.

9

IV.    **Proceedings on Remand**

Upon remand, the Court reappointed counsel who represented Eldridge at his original sentencing for the resentencing and directed the U.S. Probation Office to prepare an updated PSR.  The resentencing was initially scheduled for November 9, 2023.  On November 4, 2023, the Government filed a combined sentencing memorandum and response to Eldridge's objections to the report (Dkt. No. 958) and revived its original sentencing request that the Court impose a life sentence due to Eldridge's purported role in the murders of Smokey and Flap.

Due to the length of the trial transcript and defense counsel's indication that he lacked support staff to formulate a response to the Government's request for a life sentence, the Court adjourned the resentencing to May 28, 2024, and on January 12, 2024, appointed a second defense attorney to assist with the resentencing.  On April 23, 2024, Eldridge filed a motion (Dkt. No. 973) to adjourn the resentencing until after November 1, 2024, as the defense required more time to respond to the Government's request for a life sentence.  The defense also noted that a proposed amendment to United States Sentencing Guideline § 1B1.3, the relevant conduct provision, would go into effect on November 1, 2024, absent Congressional action otherwise.  Eldridge's position was that the proposed amendment was pertinent to the Government's motion for a life sentence, as "conduct for which a person was acquitted in federal court will be prohibited from being used in calculating a sentence range under the federal guidelines."

The Court adjourned the resentencing date and Eldridge's response date regarding the murders and ordered briefing from the parties on the applicability of the proposed

amendment to § 1B1.3.  After further adjournment of these deadlines as requested by

Eldridge (Dkt. Nos. 982, 986, 988), as of late October of 2024, the parties had fully

briefed the dispute regarding the two murders (*see* Dkt. Nos. 958, 961, 990, 993), as well

as the application of the new Guidelines amendment pertaining to acquitted conduct (*see*

Dkt. Nos. 990, 993).[9]  On November 22, 2024, the Court heard argument on the

Government's life sentence request and the recent amendment to § 1B1.3 and took the

matter under advisement.

On June 26, 2025, Eldridge filed a motion (Dkt. No. 1009) asking that this Court

schedule a purely ministerial sentencing, asserting that a *de novo* resentencing is not

required, and the Court should simply enter an amended judgment of a 25-year aggregate

sentence—in effect, vacating the 25-year sentence corresponding to the unlawful

conviction on Count 7, but retaining the sentences on the remaining counts of conviction.

The Government filed a response in opposition (Dkt. No. 1011) on July 23, 2025.

## **DISCUSSION**

I.    **The Mandate Rule, and the Default Rule in *Quintieri* and *Rigas***

"[T]he 'mandate rule' describes the duty of the district court on remand upon

receipt of the mandate, which is the appellate court's direction to the trial court[.]"

*United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (internal citation and some

internal quotation marks omitted).  "[T]he district court must follow the mandate issued

---

[9] On October 30, 2024, Eldridge filed a *pro se* motion (Dkt. No. 994) to recuse this Court.  After
receiving further briefing on that motion (*see* Dkt. Nos. 996, 997), the Court issued a Decision
and Order (Dkt. No. 1000) on November 21, 2024, denying the motion.

by an appellate court, and it has no discretion in carrying out the mandate." *United States v. Brooks*, 98 F.4th 417, 418 (2d Cir. 2024) (internal quotation marks and citations omitted); *see*, *e.g.*, *United States v. Jones*, 541 F. Supp. 3d 325, 328 (S.D.N.Y. 2021) ("Because this case is before this Court on remand from the Second Circuit, this Court is constrained by the Second Circuit's mandate[.]").

As indicated above, the Second Circuit's mandate vacated Eldridge's conviction on Count 7 and remanded the case to this Court "for resentencing on all of Eldridge's remaining counts of conviction." Dkt. No. 939, p. 11. This directive is consistent with the well-established principle that a "resentencing usually should be *de novo* when a Court of Appeals reverses one or more *convictions* and remands for resentencing[.]" *United States v. Quintieri*, 306 F.3d 1217, 1228 (2d Cir. 2002) (emphasis in original). The "default rule" created in *Quintieri*, "that a *de novo* resentencing is required where a conviction is reversed in part on appeal," stands in "clear contrast" to reversal due to a *sentencing* error, for which "limited resentencing [is] the default rule[.]" *United States v. Rigas*, 583 F.3d 108, 115, 117 (2d Cir. 2009) (clarifying that "[i]n *Quintieri*, [the Second Circuit] created a rule, not a guideline."). "*De novo* resentencing requires the district court to 'reconsider the sentences imposed on each count, as well as the aggregate sentence,' formulating anew the appropriate sentence for each unreversed conviction under the individualized assessment required by § 3553(a)." *Kaziu v. United States*, 108 F.4th 86, 88 (2d Cir. 2024) (quoting *Rigas*, 583 F.3d at 118).

Eldridge now asserts that a *de novo* resentencing would be improper, and instead the Court should schedule a purely ministerial sentencing,[10] that is, enter a judgment reflecting an aggregate 25-year sentence. In other words, Eldridge proposes "simply lopping off the sentence" of the vacated count (*Kaziu*, 108 F.4th at 92), without re-examining the sentences corresponding to the unreversed convictions.

Eldridge's argument is like that made by the defendant in *Vanderpool*, which was rejected by the Second Circuit. In that case, defendant pleaded guilty to Count One, racketeering conspiracy, and Count Fourteen, illegal use of a firearm during a crime of violence (for which the underlying crime of violence was the racketeering conspiracy), and was sentenced by the district court to 84 months' imprisonment on each count, for a total term of 168 months, which was in the applicable Guidelines range of 154 to 171 months. *See United States v. Vanderpool*, 2022 U.S. App. LEXIS 1785, *1 (2d Cir. 2022) (summary order, explaining this procedural history). The Second Circuit later vacated defendant's conviction on Count Fourteen in light of *Davis* and remanded the case for resentencing on Count One. *See United States v. Brown*, 797 F. App'x 52, 53-54

---

[10] "A 'ministerial' duty is one that 'involves obedience to instructions or laws instead of discretion, judgment, or skill.'" *Burrell v. United States*, 467 F.3d 160, 164 (2d Cir. 2006) (quoting Black's Law Dictionary 1017 (8th ed. 2004)). A "strictly ministerial" remand is one that "direct[s] the district court to undertake a single non-discretionary act," such as "the correction of language in a judgment or the entry of a judgment in accordance with a mandate[.]" *Burrell*, 467 F.3d at 165-66.

Eldridge's motion for a ministerial sentencing refers to the amount of time he has served and his "demonstrated rehabilitation while incarcerated." Dkt. No. 1009-1, p. 6. Of course, were the resentencing purely ministerial, the Court could not consider such factors in imposing sentence.

(2d Cir. 2019) (summary order).  Defendant had asked that the Circuit simply "strike" the Count Fourteen conviction and "retain" defendant's 84-month sentence on his Count One conviction.  The Circuit declined to do so, acknowledging that "[t]he District Court is uniquely positioned to determine the adequacy of any sentence in [defendant]'s case, and it should do so in the first instance."  *Id.* at 54-55.

On remand, the district court re-sentenced defendant to 156 months' imprisonment on remaining Count One.  *See Vanderpool*, 2022 U.S. App. LEXIS 1785, at *2.  On appeal from the resentencing, defendant argued the Second Circuit had erred in the first instance by remanding for a full resentencing.  *Id.*  The Circuit found, however, that a full resentencing was "indisputably" consistent with Circuit case law, including *Quintieri* and *Rigas*, and also noted *Davis*'s "warning that the defendants whose section 924(c) convictions would be vacated as a result of that decision would 'not even necessarily receive lighter sentences' on remand, because 'when a defendant's § 924(c) conviction is invalidated, courts of appeals routinely vacate the defendant's entire sentence on all counts so that the district court may increase the sentences for any remaining counts if such an increase is warranted.'"  *Id.* at *4-5 (quoting *Davis*, 588 U.S. at 469).

The Circuit also held that the district court did not abuse its discretion when it determined on resentencing that a lengthier sentence on Count One was justified, although no new facts were presented to the district court aside from the vacatur of the Count Fourteen conviction and defendant's record of post-conviction conduct.  *See Vanderpool*, 2022 U.S. App. LEXIS 1785, at *5-6.  This was because "[t]he district court adequately explained…why in its view it was appropriate to increase the Count One

14

sentence upon resentencing.  It observed that it had 'done as a whole' the original cumulative 168-month sentence for the two counts of conviction[.]"  *Id.* at *6.  At the initial sentencing the district court had determined, based on the 18 U.S.C. § 3553(a) sentencing factors, an "appropriate cumulative sentence" for the two counts of conviction was 168 months, and because the Count Fourteen conviction required an 84-month sentence consecutive to Count One, "it set the Count One sentence at a below-Guidelines 84 months to ensure the cumulative sentence was no longer than reasonable."  *Id.* at *6.  In contrast, at the resentencing, the mandatory minimum sentence from the Count Fourteen conviction was "no longer a factor; accordingly, the district court could reasonably issue a lengthier sentence for Count One."  *Id.* (citing *Pepper v. United States*, 562 U.S. 476, 507 (2011) ("Because a district court's original sentencing intent may be undermined by altering one portion of the calculus, an appellate court when reversing one part of a defendant's sentence may vacate the entire sentence…so that, on remand, the trial court can reconfigure the sentencing plan…to satisfy the sentencing factors in 18 U.S.C. § 3553(a)[.]") (internal quotation marks and citations omitted)).

Like the mandate in *Vanderpool*, the mandate as to Eldridge—on its face— dictates a resentencing on Counts 1 through 6 of the Superseding Indictment.  In the context of a full resentencing, the Government is free to argue, as it has done, that merely vacating the consecutive 25-year sentence on Count 7 would not accurately reflect the Court's consideration of the seriousness of the crimes of which Eldridge was convicted or the § 3553(a) factors.  *See Perez v. United States*, 6:18-cr-06025 EAW, 2025 U.S. Dist. LEXIS 141101, *1-2 (W.D.N.Y. July 22, 2025) (on § 2255 petitions, vacating

defendants' convictions on Count 6 as invalid under *Taylor*, and scheduling *de novo* resentencings on the remaining charges, commenting that "simply vacating the plea and corresponding sentence on Count 6 would undermine the plea agreement and would also not accurately reflect consideration of the § 3553(a) factors, nor is that approach supported by the relevant case law"); *United States v. Lorenzana*, 3-cr-1256 (JGK), 16-cv-4355 (JGK), 2024 U.S. Dist. LEXIS 223268, *30 (S.D.N.Y. Dec. 9, 2024) ("When courts invalidate a defendant's § 924(c) conviction, courts routinely vacate the defendant's entire sentence on all counts so that the district court may increase the sentences for any remaining counts if such an increase is warranted.") (internal quotation marks omitted).

When the Court imposed Eldridge's original 600-month sentence, akin to the district court's reasoning in crafting the original sentence in *Vanderpool*, it bore in mind that it was statutorily required to sentence Eldridge to a 60-month consecutive sentence on Count 4 and another 300-month consecutive sentence on Count 7. Considering the aggregate sentence the Court was imposing, and "after considering all the factors set forth in 3553(a), together with defendant's history, characteristics and crimes of conviction," the Court decided a non-Guidelines sentence of 240 months on Count 5 was sufficient but not greater than necessary to fulfill the purposes of sentencing. The Court therefore did not need to determine an applicable Guideline range for Count 5 or determine whether to hold Eldridge responsible for the murders of Flap and Smokey. Dkt. No. 835, pp. 20-21.

Indeed, the Second Circuit recognized in its summary order rejecting Eldridge's challenges to the original sentence:

> …the record is clear that the district court—having
> considered the § 3553(a) factors, the competing Guidelines
> ranges offered by the Government and Eldridge, and the
> length of the aggregate sentence it was going to impose—
> decided to impose a non-Guidelines sentence on Count Five.
> The court was free to choose any sentence from zero to life
> on this count, and it chose a sentence of 240 months.

Dkt. No. 908, p. 55.

The calculus of the original sentence, of course, has now changed in the absence
of the consecutive 25-year sentence mandated for Eldridge's now-vacated section 924(c)
crime.  *See Burrell*, 467 F.3d at 166 (noting it is a "rare" case where the Second Circuit's
"reversal of a conviction [does] not affect the 'knot of calculations' under the Guidelines
and where remand for resentencing [is] unnecessary") (quoting *Quintieri*, 306 F.3d at
1227-28).

Eldridge, operating under the assumption that this Court has discretion to
determine the scope of resentencing (which it does not, per the mandate rule), posits that
an exception to the rule set forth in *Quintieri* and *Rigas*, the rule requiring a *de novo*
sentencing to remedy a "so-called 'conviction error'" (*United States v. Powers*, 842 F.3d
177, 179 (2d Cir. 2016) (per curiam)), is applicable here.  In *Powers*, the Second Circuit
held that the "only viable exception" to that rule is "when the defendant has already
received, at his or her sentence on an upheld count of conviction, a mandatory minimum
sentence" because in such cases "a district court's amending its judgment of conviction
is, by force of law, 'strictly ministerial[.]'"  *Id.* at 180 (internal citation omitted).
Eldridge argues the exception as stated in *Powers* applies, because he previously received
statutory maximum sentences of 240 months on Counts 1, 2, and 6, and 120 months on

17

Count 3, as well as the mandatory consecutive 5-year sentence on Count 4, plus a 20-year concurrent sentence on Count 5 which was below the statutory maximum of life but was consistent with the grouping Guidelines under § 3D1.2.

As the Eastern District of New York has explained the exception in *Powers*, "[i]n other words, resentencing is unnecessary in cases where the defendant's *aggregate term of incarceration* is unchanged."  *United States v. Mendunjanin*, 10-cr-0019 (BMC), 2020 U.S. Dist. LEXIS 184874, *21 (E.D.N.Y. Oct. 6, 2020) (emphasis added); *see*, *e.g.*, *United States v. Peña*, 58 F.4th 613, 623 (2d Cir. 2022) (explaining that a resentencing is "strictly ministerial" where it would "serv[e] simply to delete the sentences on the now-vacated counts," which applied in *Peña* where the district court had sentenced defendant to five concurrent terms of life imprisonment on his counts of conviction that were each punishable by life imprisonment, and his two § 924(j) convictions were vacated); *Burrell*, 467 F.3d at 166 (explaining that the Circuit did not remand for resentencing after vacating one count of conviction but instead for the district court to "correct the judgment," because the Guidelines mandated a life sentence on defendant's second count of conviction "alone"); *United States v. Martinez*, 99-CR-1048-4 (DC), 2021 U.S. Dist. LEXIS 55942, *6 (S.D.N.Y. Mar. 24, 2021) ("Here, even with the vacatur of Count Three [for which the mandatory consecutive sentence of ten years was imposed], [defendant] is subject to a mandatory sentence of life in prison, and so any resentencing or hearing would be strictly ministerial and unnecessary."); *Young v. United States*, 06-CR-285 (ARR), 2020 U.S. Dist. LEXIS 156100, *8 (E.D.N.Y. Aug. 27, 2020) ("Resentencing is

18

particularly inappropriate where a petitioner is serving a mandatory life sentence for an unchallenged conviction.") (collecting cases).

The Court will not simply "correct" the sentence as requested by Eldridge, that is, only eliminate the punishment attached to invalid Count 7. Rather, as directed in the mandate, it will resentence Eldridge on remaining Counts 1 through 6 that were unaffected by the legal error that led to the vacatur of the invalid count.

## II. <u>Relevant Conduct and Amendment 826</u>

Under the Guidelines, a defendant's "offense" includes his "offense of conviction" as well as "all relevant conduct under § 1B1.3." U.S.S.G. § 1B1.1, cmt. n.1(I). Relevant conduct is the conduct a sentencing court can consider in determining the sentencing Guidelines range applicable to a defendant.

Amendment 826 to the Guidelines went into effect on November 1, 2024. The Sentencing Commission has not made this amendment retroactive. *See United States v. Allick*, No. 24-2034-cr, 2025 U.S. App. LEXIS 12309, *3 n.1 (2d Cir. 2025) (summary order) (citing U.S.S.G. § 1B1.10(d), which lists retroactive amendments and does not include Amendment 826). Amendment 826 modified Guideline § 1B1.3 to add a new subsection (c), which states: "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c). This amendment, then, limits the use of federally acquitted conduct from the scope of relevant conduct for the purpose of calculating the applicable Guidelines range.

19

As outlined above, the jury hung on all counts (Counts 13-15) and racketeering acts (RA 6 of Count 1 and Overt Act 6 of Count 2) related to and involving the murder and robbery of Smokey. Eldridge argues in circular fashion that the Court should equate the hung jury verdict regarding the Smokey murder with "acquitted conduct," because the Government should have retried him to obtain the life sentence it is seeking, after the jury failed to reach a verdict on those counts in 2016. Eldridge reasons he could have obtained an acquittal had he been retried, and then the Court would have been precluded from considering the Smokey murder at his resentencing for purposes of calculating his Guidelines range.[11]

Amendment 826 is specifically limited to acquitted conduct and therefore does not apply to the Court's consideration of the Smokey murder, as the jury did not acquit Eldridge of any conduct or crime related to that murder. *See United States v. Frias*, 01-cr-307-3(DLC), 2024 U.S. Dist. LEXIS 228866, *3 (S.D.N.Y. Dec. 18, 2024) ("Amendment 826 is not retroactive. This Amendment does not assist [defendant]. He was not acquitted on any charge at trial. As [defendant] acknowledges, his sentencing did not involve acquitted conduct."); *United States v. Babb*, Crim. No. ELH-04-190, 2024

---

[11] Eldridge primarily argues that the amendment to Guideline § 1B1.3 precludes this Court from considering his acquitted conduct, the murder of Flap, at his resentencing—but, as the Court noted at the outset, it declines to analyze Eldridge's role in Flap's murder. In any event, based on the Court's research, Eldridge's position is unfounded because: (1) Guideline § 1B1.3, as amended, does not exclude all federally acquitted conduct from the scope of relevant conduct considered under the Guidelines; (2) as the Government argues, the jury only partially acquitted Eldridge of the Flap murder, and the Court could consider it as relevant conduct if it made a finding that Eldridge was responsible for Flap's death under a felony murder theory; and (3) Guideline § 1B1.3 does not prohibit this Court from considering acquitted conduct when analyzing the factors set forth in 18 U.S.C. § 3553(a).

U.S. Dist. LEXIS 194144, *32-33 (D. Md. Oct. 24, 2024) ("[Defendant] was not

acquitted of the murder charges.  Rather, the jury failed to reach a verdict and the judge

declared a mistrial…Thus, [the amendment does] not apply to [defendant].").  Indeed,

"[o]fficial commentary to…amendment [826] states that '[a]cquitted conduct is unique,

and this amendment does not comment on the use of uncharged, dismissed, or other

relevant conduct as defined in § 1B1.3 for purposes of calculating the guideline range.'"

*United States v. Shanks*, No. 24-12247, 2025 U.S. App. LEXIS 14031, *8 (11th Cir.

2025) (per curiam) (quoting U.S.S.C. Notice, 89 Fed. Reg. 36855 (May 3, 2024)).  There

is no authority Eldridge relies upon to persuade this Court that when the Government

declined to retry him of the Smokey murder, this "functionally acquitted" him.  *Hatfield*

*v. United States*, No. 25-1234, 2025 U.S. App. LEXIS 4530, *2 (7th Cir. 2025)

(commenting on the "dubiousness" of a similar argument on appeal before the Seventh

Circuit).

        Moreover, even if the Court were to determine that the murder of Smokey is not

relevant conduct, it could still consider the murder at sentencing—just not as part of its

Guidelines calculations.  *See*, *e.g.*, *United States v. Montalvo*, 20-4176-cr, 2022 U.S.

App. LEXIS 25968, *4-5 (2d Cir. 2022) (summary order) ("Because it issued a variance,

the district court was not required to find that [defendant]'s discharged conduct was

related to the offense of conviction before factoring that conduct into the sentence.")

(citing 18 U.S.C. § 3661).

## III.    <u>Standard of Proof</u>

Eldridge argues that if the Court considers the hung counts, it should evaluate the evidence under a clear and convincing evidence standard of proof rather than by a preponderance of the evidence.  The Court previously rejected this argument at Eldridge's original sentencing.  *See* Dkt. No. 835, pp. 14-15 ("[T]he Court notes that the Second Circuit has repeatedly held that proof by a preponderance of the evidence is the applicable burden of proof when a sentencing judge is to assess disputed facts relevant to sentencing.") (citing *United States v. Vaughn*, 430 F.3d 519 (2d Cir. 2005) and *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000)); *see also* Guideline § 6A1.3, comment ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

After Eldridge was sentenced in 2018, the Second Circuit reiterated that "the standard of proof for the district court's factual findings at sentencing…is a preponderance of the evidence…A district court should, however, take into consideration the degree of proof satisfied beyond a preponderance when exercising its discretion to decide whether and how much to depart."  *United States v. McCray*, 7 F.4th 40, 49 (2d Cir. 2021)[12] (citing *Cordoba-Murgas*, 233 F.3d at 709-10); *see United States v. Martinez*,

---

[12] *See also McCray*, 7 F.4th at 49 ("[W]e reject [defendant]'s argument that due process required the district court to apply a higher standard of proof than a preponderance of the evidence. *Cordoba-Murgas* forecloses this argument and clarifies that the application of a more stringent standard, such as a clear and convincing evidence standard, *would in fact constitute error*.") (emphasis added).

10-CR-233S (1), 2016 U.S. Dist. LEXIS 111581, *6 n.3 (W.D.N.Y. Aug. 22, 2016)

(rejecting defendant's argument that a clear-and-convincing standard applies when

considering acquitted conduct at sentencing because Circuit precedent "does not call for a

heightened standard, but rather, discusses the role of the weight of evidence proving

relevant conduct in considering sentence severity"), *aff'd*, 769 F. App'x 12, 16-17 (2d

Cir. 2019) (summary order).

As such, the Court will consider Eldridge's role in the murder of Smokey under a

preponderance of the evidence standard of proof.

## IV.    <u>The Murder of Smokey – April 6, 2005</u>

Below, the Court summarizes the proof at trial with respect to Smokey's murder

and determines whether it will consider additional proof submitted by the Government.

The Court then evaluates, from its review of the trial transcripts, its recollection of the

trial testimony, and its notes, whether the Government proved Eldridge's role in the

murder and whether the Government proved the murder is relevant conduct such that it

will be used in calculating Eldridge's sentencing Guidelines range.

### A. *Trial Proof*

With respect to the Government's trial witnesses, Smokey's first cousin, Steve

Martin, testified as an eyewitness to Smokey's murder.  Two addicts who bought crack

cocaine from Smokey, Byron Keith Barnes and Cynthia Walker, also testified about their

observations surrounding Smokey's murder.  The jury additionally heard from Sam

Jones, Sr., Smokey's father, who observed Eldridge and Allen together prior to the

murder, and Leo Jones, Sr., Smokey's uncle, who was confronted by Allen the day

following the murder.  Henry Lloyd testified about admissions made by Allen in his presence after Smokey's murder, and three witnesses, *i.e.*, Ralph Neasman, Samuel Cuyler, and Rufus Feaster, each testified about admissions Eldridge made to them about either Smokey's murder or about committing murders more generally.  Last, Jamile Lee testified about Smokey's status as a "snitch."

The Government also entered into evidence a map of the relevant area on the East Side of Buffalo, New York, which the eyewitnesses to the murder marked during their testimony.  Other pertinent exhibits included the autopsy report and photographs of the crime scene, the section of the street where Smokey was murdered, and Smokey's bullet wounds.

Only one defense witness testified, Lea Jones, the daughter of Leo Jones, Sr., in an effort to discredit Steve Martin's testimony about meetings held by the enterprise in Lea Jones's parents' basement, during which members of the enterprise discussed their plans to rob drug dealers, including Smokey.  According to Steve Martin, Eldridge was present for those planning sessions.

A more detailed summary of the trial proof follows.

### 1.  Testimony of Steve Martin ("Martin")

As mentioned above, Martin testified as an eyewitness to the murder of Smokey. He admitted that he had never held a job due to his involvement in drug dealing.  Martin had felony convictions for robbery, criminal possession of a controlled substance (intent to sell), burglary, and felon in possession of a firearm.  After his arrest that led to his federal felon-in-possession conviction, on January 19, 2006, he gave a statement to the

Buffalo Police Department ("BPD") regarding the shooting death of Smokey from nine months prior.[13]  This was the first time Martin spoke with law enforcement about the incident; he did so then because he was otherwise facing potential life in jail.  About one month after Martin gave his statement to the BPD, he entered into a proffer agreement with the U.S. Attorney's Office.  He later entered a cooperation agreement and avoided the otherwise mandatory minimum of 15 years' incarceration as an armed career offender.  He was sentenced to 100 months and ultimately served 8 years.  At the time of the trial, Martin was on post-release supervision.

Martin testified about his role in the Montana Bridge Gang ("MBG"), which centered around Montana Avenue on the East Side of Buffalo, New York.  From the mid-1990's to early 2000's when he was not in jail, he and his fellow gang members participated in robberies, burglaries, and shootings; sold drugs (crack and heroin); and possessed firearms to protect their drug territory.  Martin had been friends with Allen, Eldridge, and Speed since childhood, and they were all from the same neighborhood.  Smokey was Martin's first cousin.  Smokey and Speed were a part of the MBG, along with Martin, and Martin recruited Allen, who was four or five years younger than him.  The MBG was aligned with the Newburgh Crew, which was "younger Montana Street."  Newburgh was a street located within a 15-minute walk from Montana Street.  Eldridge was not a member of the MBG, but he was related to members of that gang and the Newburgh Crew "[t]hrough marriage"; he hung out with "[q]uite a few" members of the

---

[13] *See* Gov't Ex. #501B (BPD statement, 1/19/2006).

MBG; and based on Martin's observations, he associated with "[a]ll" members of the Newburgh Crew.  Leo Jones, Sr. ("Leo"), Smokey's uncle and a supplier for the MGB, resided at 315 Newburgh with Joanie Jones ("Joanie") who was the aunt of Speed and Eldridge (Speed and Eldridge were cousins), and Leo's and Joanie's children.  Leo's son, Leo Jones, Jr., was a member of the Newburgh Crew.

By selling drugs, Martin and other members of the MBG learned who other prominent drug dealers on the East Side were.  In the late 90's to early 2000's, members and associates of the MBG and Newburgh Crew targeted drug dealers to rob.  When incarcerated at Gouverneur Correctional Facility with Allen in 2002, Allen told Martin he would be going home to "do robberies" and asked him to help as soon as Martin was out of jail.  On January 24, 2005, Martin was released from jail, and he remained out until May of 2005, when he returned to jail for a parole violation.  Allen had gotten out one year before him.  One day after Martin's release in January of 2005, Allen told Martin he was "robbing the town" with Speed and Eldridge, meaning they were targeting and robbing drug dealers.  Martin agreed to participate in this activity.

Several days after Allen told Martin this, and in the basement of the Jones house at 315 Newburgh, Martin met up with Speed, Eldridge, and Allen to discuss different robberies.  The basement looked like a living room, with a couch, a television, sitting chairs, and a table.  Eldridge joined them all from the back room in the basement but did not say anything.  As far as Martin knew, Eldridge was living in the basement at this time. While speaking about robbing various individuals, Smokey's name came up.  When Smokey's name was mentioned, Speed gave Allen a look as if to imply Allen should shut

up considering that Martin, Smokey's cousin, was present. The conversation about Smokey ended at that point. A total of approximately 12 meetings were held in the basement of 315 Newburgh between January and May of 2005. Every time the group met, they discussed robbing drug dealers, the purpose of which was "[t]o get fast money, fast drugs," meaning "you rob a drug dealer, you basically get the drugs at wholesale."

Martin also met up with Smokey after his release from jail. Smokey was living midway down Goodyear Avenue, between East Ferry Street and Genesee Street, and he had told Martin to come over because he had something for him. Martin decided to see Smokey because he kept hearing Smokey's name and how he was doing well for himself. At Smokey's, which appeared to be a crack house, Smokey gave Martin money and 4 ½ ounces worth of crack valued at $9,000,[14] and told Martin to "get down with him, to mess with him." Martin thought Smokey gave him crack so that Martin would protect him. Martin said he would think about it, although he ultimately did not join Smokey in selling crack. He did not say anything at this meet-up with Smokey about what he had previously heard in the basement of 315 Newburgh: while Smokey was Martin's family, Allen was Martin's friend who Martin was more "in tune" with. Days before Smokey's murder, though, Martin did alert Smokey that people were looking to rob him and warned him to watch out and that Allen was going to get him. Smokey did not appear worried.

---

[14] On cross-examination, Martin agreed that in his grand jury testimony on October 2, 2008, he testified that Smokey gave him $2,500 in cash but he did not mention any gift of crack cocaine. He clarified on cross that Smokey gave him both $2,500 in cash, plus $9,000 worth of crack.

The date of Smokey's murder, April 6, 2005, Martin sold heroin for about 12 hours outside a store called The Island, on Doat Street/Montana Avenue and Genesee Street.[15] That day, he observed Allen and Eldridge circling the neighborhood "[q]uite a few times," *i.e.*, 15 to 20 times, in a car that was a "funny color green"—a car Martin had not seen Allen in before.[16]  Allen was driving and Eldridge was the front seat passenger, and they were going under the speed limit at 5-to-10 miles per hour.  At around 7:30 or 8:00 p.m. when it was dark out, Martin saw them circle the neighborhood about five times.

Martin left The Island after completing his drug sales and after it got dark, but he needed wax paper and heroin bags, which he typically bought at a store called "Big Fellas" or "Big Boys" (hereinafter, "Big Boys") on Goodyear Avenue and East Ferry Street.  The Island and Big Boys were about a four-minute walk from each other.  Before he left The Island, an older male from the neighborhood asked Martin for a ride to a house on Goodyear, four or five houses down from Smokey's house.  Martin dropped this individual off at that location but parked his car a couple of houses down and closer to Smokey's (that is, in front of and between that house and Smokey's house),[17] and walked down to Big Boys.  Once he arrived at Big Boys, it was much later than 9:00 p.m. Outside Big Boys, Martin saw Smokey and a handful of other individuals standing

---

[15] *See* Gov't Ex. #382 (Google Earth map of pertinent area, depicting Montana Ave, Doat St, Genesee St, E. Ferry St, Bissell Ave, Goodyear Ave, and Nevada Ave).

[16] Martin testified that every other time Allen gave him a ride from January through May of 2005, Allen was driving a blue Oldsmobile.

[17] Martin marked an "X" and initialed it "SM" on Government Exhibit #382, indicating where he had parked his car on Goodyear that evening.

around, including two he recognized, a male named Jermain and a female named Tamara. Martin spoke with Smokey and Jermain for a few minutes, but he did not recall the content of their conversation.

After obtaining his drug baggies and exiting Big Boys, Martin saw Allen pull up in the green car and park right in front of the store, on East Ferry. Smokey had gone across the street in front of Cambridge and East Ferry, directly across from Goodyear, with a potential drug customer. When Allen pulled up, Martin saw Eldridge exit the car, pull his hood up over his head, and walk down Goodyear in the direction of Genesee and Smokey's house (which again, was approximately in the middle of the block on Goodyear). Martin proceeded to the car's window and leaned in, and Allen told him, "Watch this cousin, we about to get Smokey." Martin observed a bottle of Hennessy in the car, which Allen was drinking. Smokey was still across the street, and Martin told Jermain to warn Smokey about the impending robbery because Martin was heading back to his car to go home and bag up his drugs.

Martin walked down Goodyear in same direction Eldridge had gone, and on the same side of the street as Smokey's house. On his way to his car, Martin saw Eldridge in "the yard" near Smokey's house, on the shortcut to Bissell Avenue (Bissell is one block west of Goodyear) and with his hood on.[18] Martin did not speak to Eldridge; he walked past him and kept walking towards his car, which was parked a little farther up from that

---

[18] *See* Gov't Ex. ##383D and 383J (photographs of the shortcut from Goodyear to Bissell). On redirect, Martin explained that when Smokey was killed, the empty lot in Exhibit #383D was not empty; in April of 2005, the lot contained a house that had since been knocked down.

spot.  He also did not say anything to Smokey, who was four- or five- house-lengths behind him.

When Smokey approached Eldridge's location, Eldridge came out of the cut as Martin was getting in his car.  Eldridge "popped out [of the cut], told him to give it up." Smokey responded, "I ain't giving you nothing," and he "tried to run off."  Martin was about three houses down from this exchange.[19]  When Smokey tried to run away, Martin heard the first shot, and he was looking in that direction.  Martin did not know if the first shot hit Smokey.  Smokey then turned, facing Eldridge, with his back to Martin.  A second shot was fired, and Smokey put his hand up, and then there was a third shot and Eldridge ran through the shortcut to Bissell.  Martin observed Smokey fall to the ground. Martin then entered his car and went around the block; he drove down Goodyear, made a right on Genesee, and came up Bissell and back up East Ferry.  While driving, Martin saw Eldridge come out of the shortcut on Bissell and proceed down Bissell to the corner of Goodyear and East Ferry (by Big Boys), where he got into the green car with Allen and headed towards Bailey.[20]  Martin proceeded to the house of Smokey's father, Sam Jones, Sr. ("Sam"), to tell him what had happened, but Martin did not find him that night. Martin never returned to the murder scene.

---

[19] On cross-examination, Martin recalled that in the grand jury, he testified he was only ten feet away when Smokey was shot at the first time, which was inconsistent with what he told the police in 2006—that he was two houses away from Eldridge when Eldridge shot Smokey.

[20] On cross-examination, Martin was asked how he knew who the getaway driver was.  He admitted that he could not have known who was driving.  Martin explained that he had inferred Allen was the driver from the fact that Allen was driving the green car when he and Eldridge had pulled up in front of Big Boys initially.

The morning after the murder, Martin put Allen in touch with Sam. Martin made the phone call and heard the two of them arguing and yelling. Allen said he had nothing to do with Smokey's death, but Sam countered he knew "they" did it because he had seen "them" riding around all day long.

Days after the murder, Martin met with Eldridge, who had been looking for him and passed his phone number along to him. Eldridge pulled up on Montana and told Martin to keep his name out of what had happened to Smokey and keep it in the streets, which Martin took to mean keeping the police out of the situation. By the time Martin and Eldridge had this conversation, Martin had already told Sam what he had seen.

On cross-examination, Martin explained that his friendship with Allen prevented him from warning Smokey about the robbery himself, even though Smokey had recently gifted him money and drugs. Despite knowing Smokey might get robbed on Goodyear, Martin walked down Goodyear instead of remaining at Big Boys to warn him. Martin testified, however, that as Martin headed down Goodyear and before he approached the cut-through, he slowed down when he saw Smokey was behind him to let Smokey catch up. Slowing his pace "[c]ould have been" so the shooter would not shoot them both.

During the entire exchange between Eldridge and Smokey, Martin did not run or attempt to take cover, even when he heard the first shot. He testified: "There was no need to run. My car was right there." Martin also explained that he had been around a lot of shootings on the East Side,[21] so he was not scared that Eldridge might shoot him, or that

---

[21] Martin admitted this was contrary to his grand jury testimony that he had not previously been present for any shootings on the East Side.

he would get shot accidentally in the crossfire.  He further testified there was no need to run—he knew from the discussions in the basement that he was not the intended target.

Martin also testified that he did not see anyone walking with Smokey, or anyone ahead of him walking in the direction of Genesee.  He saw a car with its lights on stopped on Goodyear and East Ferry, but that was nowhere near where Smokey got shot.

With respect to his position during the shooting, Martin testified that he had fully turned around (and did not just look over his shoulder) when he heard the second shot and saw that Smokey had stopped and turned and was also facing the shooter.  Martin was at his car, standing adjacent to it.  Smokey's back was to Martin because they were both facing the shooter, which is when the shooter fired the second and third shots, close in time.  Smokey did not put his arms up; rather, he put one hand out in front of his chest in a defensive posture, "like he could block it [the bullet]."  Martin did not recall if Smokey's right hand or left hand was raised, although he had "[p]robably" told the grand jury it was his right hand.[22]  Martin was then asked, "if Smokey's back was to you, how would you have seen which way his hand was facing?"  Martin replied, "Because he's on the sidewalk and I'm in the street.  I'm at the driver door."  Martin testified that Smokey was shot on the sidewalk and fell where he was shot, although Martin did not know if he died on the sidewalk "right then and there."

---

[22] In the grand jury, Martin testified that Smokey "[p]ut his right hand over his chest."  Gov't Ex. #501A (GJ Tr., 10/2/2008), p. 65.

Martin agreed with the Defense that in his statement to the BPD in 2006, he did not mention that Allen and Eldridge were driving around the neighborhood many times that day or that he had seen Allen's car before he saw it parked in front of Big Boys. Furthermore, Martin had not said anything to the police about the shooter running through the cut towards Bissell after killing Smokey. In addition to telling the BPD that he was two houses away from the shooting, Martin also told the BPD he was inside his car when Smokey was shot. He further told the BPD that he could see because the streetlights were all on and some porch lights were on.[23] At trial, Martin insisted that the side of the street where the shooting occurred had streetlights, upon which he was shown Government Exhibit #383D. Martin agreed that the photograph did not depict any streetlights on the side of the street where the shooter had been hiding near the cut, and the closest streetlight was one or two houses down and on the opposite side of the street.

In all his conversations with Allen after Smokey's murder and before Martin returned to jail in May of 2005, Allen never told Martin if they got any money or drugs off Smokey. When Smokey was shot and fell to the ground, the shooter was "[p]robably three feet" away from Smokey, according to Martin. Martin did not recall if the shooter continued to move towards Smokey after the third shot and he did not see if the shooter had taken anything from him. Martin had no knowledge at the time of the shooting that "Smokey was snitching," and no one told Martin they "wanted Smokey out of the way."

---

[23] In his statement to the BPD, Martin was asked, "How were the lighting conditions[?]," and he responded, "The street lights were on. I could see good." Gov't Ex. #501B.

On redirect examination, Martin testified that as he was walking down Goodyear the night Smokey was shot, he saw Smokey stop and speak with Allen in front of Big Boys, and Allen was in the driver's seat of the green car then. Martin was also asked to review his statement to the BPD, after which Martin agreed with the AUSA that he never said he was in his car when Smokey was shot.[24] Martin also testified that the AUSA asked him more detailed questions in the grand jury than the BPD asked him in 2006, and he had never wavered from stating Eldridge was the shooter and Allen was the driver.

## 2. Testimony of Byron Keith Barnes ("Keith")

According to Keith, he met Smokey at Big Boys that day to obtain some drugs; he also saw Cindy (Cynthia Walker) at the store.[25] He recalled this was after 5:00 p.m., because he had a job during the day and it was the middle of the workweek. Keith had no money, though, and was hoping Smokey would give him "free" crack he could work off by sending Smokey some customers. While at Big Boys, an individual named "Smiley" gave $7 to Keith to obtain crack for him. From Big Boys, Smokey led Keith and Cindy to Yolanda's house, which was a crack house about one block from Big Boys, on East Ferry. At Yolanda's, Keith spoke briefly with Sam (Sam Jones, Sr.), and Smokey went into the house for just a few minutes.

---

[24] Martin's statement reads: "Q. How far away were you when Thamud shot Smokey? A. Two houses down in the car." Gov't Ex. #501B.

[25] Keith circled the location of Big Boys on Government Exhibit #382 and wrote his initials "BKB" next to that circle.

Upon leaving Yolanda's, Keith, Smokey, and Cindy walked down Goodyear towards Smokey's house to get drugs. Although they were walking together at the corner, Smokey and Cindy eventually trailed behind Keith as they continued down Goodyear. Keith had sped up his pace because he had not had crack for hours and wanted some badly. While walking, Keith heard a male voice say, "give it up," and then "pow pow," which sounded like one or two gunshots.[26] He started to run, straight up Goodyear towards Genesee. He stopped in an empty lot and looked back but no one was there. Keith returned to where Smokey had been, but Smokey had "ran up and he fell and died." Keith asked Smokey if he was all right. Smokey did not respond; "the air came out of his chest and he died." Right after this, Keith returned the $7 to Smiley at Big Boys to establish he had nothing to do with the shooting. He then came back to the scene to speak with the police, who took him downtown to give a statement. While he was cooperative and made it clear he had seen something, he still wanted to distance himself from the situation.

Because he had been walking ahead of Smokey and Cindy, Keith could not identify the shooter. All he noticed was "it was a tall one and a short one," which he knew from turning around to his right or left for a split second to look behind him, and seeing "one was taller than the other." These figures could have been 10 to 15 houses away from him. He had no idea where these individuals went, or where they came from. Their skin tone appeared to be "lighter than Smokey," with the short one appearing to be

---

[26] On cross-examination, Keith was asked whether he recalled "at least two shots, maybe three," and he agreed, "Yeah. Two, maybe three."

the lighter of the two.  But it was dark out and the lighting on the street was dim, so Keith could not be sure.  Keith was also drunk at the time.  Keith was asked by Allen's counsel whether he knew Allen, who was light-skinned, and Keith testified he did not know him.

Keith did not see Smokey do anything right before the shot or shots were fired; he was just making sure Smokey was behind him, at the time.

On cross-examination, Keith testified that the BPD asked him the night of the shooting what the shooter looked like, but nothing in his statement indicated if the shooter was light- or dark-skinned, and he did not see anything in his grand jury transcript about a light-skinned individual being with Smokey.  He only got a "real brief glimpse" when he looked back over his shoulder, and while there could have been streetlights where Smokey was standing, those are "far and few," and only houses in the suburbs keep outdoor lights on at night.  Keith thought that when Smokey was shot, he was in the street, and Cindy was, too, speaking with Smokey and close by.  He did not notice any cars or car lights in that area.

### 3.  Testimony of Cynthia Walker ("Cindy")

Cindy testified that the evening Smokey was killed, she purchased crack from someone at Big Boys and saw Keith there.  From Big Boys she walked to Yolanda's herself.  Yolanda was Smokey's girlfriend, and her house was situated about four or five houses from the corner store at Goodyear and East Ferry, and in the middle of Nevada

and Goodyear.[27]  At Yolanda's, Cindy was with Keith, Yolanda, possibly Sam (Sam

Jones, Sr.), and a few others.  They were all getting high when Smokey walked through

the door.  Cindy had run out of crack then, and she asked if Smokey had anything.  Cindy,

Keith, Yolanda, and Smokey all left Yolanda's at the same time, making a left on

Goodyear and heading towards Smokey's house on that street, and in the direction of

Genesee.  Smokey's house was about three-quarters of the way down the block, closer to

Genesee than East Ferry, on the right-hand side, and five or six houses from the corner of

Genesee.[28]  In April of 2005, there were several cut-throughs to get from Goodyear to

Bissell, because there was only sporadic fencing between the two streets.

        Keith and Yolanda were walking behind Cindy and Smokey, in a "trail, one person

to the next person."  Cindy was closest to Smokey, who was behind her.  As they walked

down the street, she saw Smokey approach a man sitting in the driver's seat of a car

across the street from her, on Goodyear and six or seven houses down from the corner

store on Goodyear and East Ferry.  The car was at the curb line, and if she "wasn't

mistaken," it was white.[29]  There was a streetlight but the lighting near the car "wasn't

too good."  Cindy saw Smokey and the driver having a conversation.  She did not see

---

[27] Cindy circled on Government Exhibit #382 the general area where Yolanda's house used to be situated, with her initials "CW" in the center.  On the map, that lot was empty; Yolanda's house had been knocked down sometime after April of 2005.

[28] Cindy circled the approximate location of Smokey's house on Goodyear on Government Exhibit #382 and wrote her initials in the middle of the circle.  This was close to the "X" Martin had marked indicating the location of his parked car.

[29] Cindy placed her initials and a circle on Government Exhibit #382, in the area where she observed the white car.

anyone else in the car, although if she was "not mistaken" it had tinted windows. The driver's window was down, and the driver was leaning out the window. She observed him from the middle of his chest to the top of his head. He was a light-skinned black male, and Smokey appeared to know him.

Cindy kept walking, and noticed a light-skinned, heavyset girl walking down the street, with her hair in a ponytail and wearing a white sweater. The girl and a dark-skinned black male were both walking near each other on the sidewalk. The man walked off the sidewalk near the location of the cut-throughs and towards Smokey; he had "possibly" come from the cut-through, and it looked as if he and Smokey would intersect. Next, Cindy heard someone holler, "drop it," and a gunshot. Cindy had walked about 25 feet up Goodyear at that point.

After hearing the shot, Cindy turned around facing East Ferry, and Smokey was walking towards her. He said, "I've been shot," and fell and landed in the road. Cindy laid him down on a tree stump and ran to her friend's house to call an ambulance. She then returned to the scene and held Smokey until help arrived. People started emerging from everywhere and asking if she knew who shot Smokey, but she did not know. Cindy was taken to the police station, and she gave a statement, telling them what she knew.

On cross-examination, Cindy testified that Smokey was a friend, not just her supplier. She was drinking alcohol and high on crack cocaine the night he was murdered. The night of the shooting, the police asked Cindy if she saw who shot Smokey, and she said she did not; they did not ask her if the shooter was black, or light-skinned or dark-skinned. Cindy never told the police about the man in the white car who had been

speaking with Smokey just before he was shot or about the man near the cut walking towards Smokey, although she was not asked about that information specifically. She remembered the driver in the white car "the whole time," but she was never asked that question. The white car was "almost brand new," and midsized. Although the driver was light-skinned, Cindy testified that she did not know Allen. When she heard someone say, "drop it," she did not know who the speaker was addressing, and before that moment, she did not see anything in Smokey's hands.

On redirect, Cindy testified that when she used crack and was high, she could still see and could "[s]ometimes" remember things. She was scared the night she went to the BPD, and she did not reach out afterwards with more information because she was still living in the neighborhood after the shooting and was "terrified for [her] life."

### 4. Testimony of Sam Jones, Sr. ("Sam")

Smokey's father, Sam, also testified. Sam explained that his family owned a house on Goodyear, almost in the middle of the block. In 2005, the family moved one block over to Bissell, but Smokey remained in the house on Goodyear and sold crack out of it. On a good day Smokey could make $1,500 to $2,500 in sales. While Smokey primarily sold out of that house, he also sold drugs at Yolanda's and Big Boys. A lot of Smokey's customers were addicts, including regular customers Cynth (Cindy), Keith, and Tamara. Around 2005, Smokey won $30,000 in the lottery and flashed his money around; just before April of 2005, Sam told him to cool down and stop doing this.

At about 5:00 p.m. on April 6, 2005, Sam arrived at Yolanda's. He was there mostly to socialize (he did not use any drugs there), and he was also trying to sell two

bags of crack cocaine.  Possibly around 6:00 p.m. or 7:00 p.m., Smokey arrived at

Yolanda's and Sam let Smokey take a customer of his.  Smokey was present for only ten

minutes, as he was there for business.  Sam observed Smokey leave Yolanda's with Keith

and Cindy to "get what they needed," which was more crack than what Sam had on him.

They said they were going to Goodyear, which Sam understood to mean Smokey's house.

About five minutes after they left, Cindy ran back to Yolanda's saying, "they just shot

Smokey, they just shot Smokey."  Sam ran up Goodyear and found Smokey lying in the

middle of the street.  He had been shot in the heart.  Multiple times earlier that day, and

specifically around 6:00 or 7:00 p.m., when it was dusk, Sam had seen Allen and

Eldridge, who he knew and identified during the trial, driving around alone in a dark

green Taurus, on Goodyear, Bissell, and around that neighborhood.

On cross-examination, Sam testified that he did not know if Smokey was

"snitching" on other drug dealers in the neighborhood before he was killed.  On redirect,

Sam stated he first noticed Allen and Eldridge driving at around 4:00 or 5:00 p.m.

### 5.  Testimony of Leo Jones, Sr. ("Leo")

Leo, who was Smokey's uncle and Sam's brother, testified about the basement at

315 Newburgh and a confrontation by Allen one day after Smokey's murder.  Leo

testified that he sold drugs between Genesee and East Ferry.  He supplied people on

Montana with heroin, some who were part of the MBG, including Speed and Smokey.

Leo testified that in or about 2003, Eldridge stayed in the basement of Leo's house

at 315 Newburgh.  This was not with Leo's permission; rather, Leo's now-ex-wife Joanie

let Eldridge stay there.  In 2003 to 2005, the basement was fully furnished with a sitting

room, two bedrooms, a laundry room, and a bathroom.  Eldridge slept on the couch
because the bedrooms were occupied by two of Leo's sons, Leo Jones, Jr. and Mario
Jones.[30]  When Eldridge stayed there, Leo observed Allen visiting him once and saw
Speed visiting him.  To Leo's knowledge, Martin was never at 315 Newburgh.  Leo
conceded, however, that when Eldridge lived in the basement, Leo would not go down
there often, and he did not know who was down there at all hours of the day.

The day after Smokey's murder, Leo and his family members were at a backyard
barbeque on Montana when Allen pulled up with Eldridge.  They got out of the car.
Allen came into the backyard and said generally to the people there, "who put my name
in the streets, saying I supposed to kill Smokey," and "I don't know who keeps saying
that, man, 'cause they could get it too, whoever was saying that."  Allen had a gun on
him; Leo saw the handle of it hanging out of his waist.  Leo responded, "oh, man, so who
is saying that then?"  Allen did not respond directly; he kept saying, "I supposedly killed
Smokey," and he appeared angry and upset.  Leo's impression was that Allen was trying
to "[i]ntimidate" people.  Eldridge did not say anything.  Leo walked away and let Allen
and Sam talk it out.  Leo never discussed this incident with Allen or Eldridge afterwards.

Leo acknowledged he had three prior federal felonies and some New York State
convictions.  In 2003, he was charged with participating in a multi-defendant drug
conspiracy with Speed and others, and around that time Smokey was charged in a
separate federal case.  Leo learned from Smokey about two months after he was charged

---

[30] Leo testified that in the 2003-2005 timeframe, Leo Jones, Jr. and Mario Jones were both in
their 20's and part of the Newburgh Crew.

in 2003, and about two months before Smokey died, that Smokey was informing on him, although Smokey was not the "only one." Leo told Smokey that he already knew this and had figured it out, and "laughed [it] off." He was not mad at Smokey because he knew "it wasn't just him telling." Leo did not tell anyone aside from possibly Earl Howard, another supplier of the MBG and one of his co-defendants, that Smokey was an informant.[31] Leo did not hear any rumors that Smokey was "snitching." He denied arranging for someone to kill Smokey because he was "real close" with Smokey and looked out for him. Leo also testified that Smokey had won about $30,000 in the lottery about one month before he died, which was widely known in the neighborhood because Smokey told people about this and he was flashy with his money.

### 6. Testimony of Henry Lloyd ("Lloyd")

Henry Lloyd testified about an incident at a different barbeque. Lloyd had two federal felony convictions, for possession with intent to distribute cocaine base and conspiracy to commit money laundering. He had served his time and was no longer in custody at the time of trial, but he had a cooperation agreement he was required to abide by. Lloyd testified that Allen was four or five years older than him, and around 2003-2004 when Lloyd was 16 or 17 years old and selling crack cocaine, Allen robbed Lloyd of an ounce of crack and $350. Lloyd met Eldridge in jail and did not know him "too well" but was able to identify him in the Courtroom. He also knew Smokey, who was a

---

[31] Leo was asked by the prosecutor, "After you found out that Smokey was the informant on your case, did you tell Earl Howard about it?"; Leo testified, "Uh-uh." It is unclear whether this was a negative or an affirmative response.

neighborhood associate.  In 2004 when it was "getting nice outside" (Lloyd was unsure of specific dates), Lloyd heard that Smokey had been killed.  The same day he heard this, Lloyd and a couple of other males from his neighborhood went to Ivy Street for a barbecue.  A car pulled up to the barbeque; Allen was a passenger in the car, and he was with a couple of other people.  Lloyd saw three people exit the car, including Allen. Allen was holding a beer case and approached Lloyd.  Lloyd and Allen had never really gotten along, but Allen got along with the five or six other people Lloyd was standing with.  Those other individuals said, "that's fucked up what happened to Smokey."  Allen replied, "fuck that rat ass nigga.  He deserved what he got.  We had to do him."  Lloyd understood this to mean Allen was involved in Smokey's murder.

### 7.  Testimony of Ralph Neasman ("Neasman")

Neasman grew up on the East Side, and he had known Eldridge for about 20 years from the neighborhood.  Neasman had been a part of the BMW ("Buffalo's Most Wanted") gang, and he had a history of targeting drug dealers to rob them.  He had also sold drugs and possessed guns as part of the BMW gang.  After Neasman was released from jail in May of 2005, and in June or July of that year, he was sitting outside of his marijuana house on Ivy Street when Eldridge pulled up wanting some marijuana to smoke.  By this time, Neasman had heard about Smokey's murder through the neighborhood channels.  Eldridge told Neasman he was "getting it in," which Neasman took to mean "[g]etting licks" or "[r]obbing people."  Eldridge also talked about getting money and asked Neasman if he would be "down," which Neasman understood to be a request to commit robberies with him.  The topic of Smokey's murder came up

"[v]aguely" in their conversation; Eldridge "said they got some money for knocking him off," and he got this money from "somebody like his uncle or somebody like that." Neasman understood "knocking off" to mean killing Smokey.

### 8. Testimony of Samuel Cuyler ("Cuyler")

Cuyler grew up in Rochester, New York, and was incarcerated in a cell right across from Eldridge's at Chautauqua County Jail in 2009. Cuyler was there for violating a juvenile conviction. He also had a misdemeanor conviction in 2013 for the misuse of food stamps. He and Eldridge bonded over Cuyler's brief, previous membership in the Bloods gang and Eldridge's proclaimed leadership in the Bloods. Eldridge told Cuyler that Cuyler could work for him, and he would take care of him. He explained that he had teenagers and people around Cuyler's age working for him because they would not get into serious trouble if they were caught, and if you recruit people around that age, they will remain loyal.[32] Cuyler believed Eldridge was trying to recruit him. Eldridge said that as a Blood in Buffalo, "he had people killed and tooken [sic] care of and stuff; said that he got shot in the back of his head—The person who shot him in the back of the head, he had him taken care of." Cuyler's understanding of "taken care of" was that Eldridge had that person murdered. Cuyler reached out to the FBI with this information both because he wanted to benefit himself by getting out of jail and home to his family, but also because he felt bad about Eldridge using young people and he believed Eldridge was a bad and dangerous person.

---

[32] Cuyler was 27 years old when he testified, so in 2009 would have been 19 or 20 years old.

### 9.  Testimony of Rufus Feaster ("Feaster")

Like Cuyler, Feaster testified about being housed in the same cell block as Eldridge at the Chautauqua County Jail.  This is where Feaster was incarcerated from August through October of 2009.  Feaster first met Eldridge in jail and learned they grew up in the same neighborhood.  Feaster grew up on Montana, but he did not know Eldridge because he was 10 years younger than Eldridge.  In jail, Eldridge asked if Feaster could contact his attorney and tell his attorney that Feaster heard a guy named "Reese" killed Smokey.  Feaster had never heard this and did not know who Reese was.  He understood Eldridge wanted him to lie to "deflect attention off of [Eldridge] onto Reese."  Feaster said he would do this, although at the time he was undecided if he would or not.  Eldridge seemed relieved and happy in response.  Thereafter, Eldridge repeated this request five times, and Feaster responded each time that he would get in contact with his lawyer.

Feaster testified that he eventually asked Eldridge more questions about Smokey, including what happened with that situation and why he got killed.  Feaster knew Smokey from the neighborhood, and he had never known why Smokey was murdered or who was behind it.  He asked Eldridge why Reese did it, and Eldridge said that Smokey and Reese had "problems" or "beef" back then.  Feaster then asked Eldridge, pointedly, if Eldridge did it.  According to Feaster, Eldridge "kind of paused and then was like, he [Smokey] was a snitch, I had to get him out the way."  After this conversation, Feaster wrote to the U.S. Attorney's Office and entered into a proffer agreement.  Feaster was otherwise facing 40 years in his federal case for conspiracy to distribute 500 grams or more of cocaine, but he ended up getting/serving about 6 years due to his cooperation.

### 10. Testimony of Jamile Lee ("Lee")

Lee testified about Smokey's status as a "snitch."  Lee, an MBG member, testified about the gang's activities between 1997 and 2001, including the robbery of drug dealers. He engaged in such activity with Allen, Speed, and Martin, who were all MBG members (as was Smokey), which was "[e]asy money," because "the money is stored in houses, not banks," and "[m]ost drug dealers don't go to the police."  Between the late 90's and 2001, Lee and Allen scoped out houses to rob.  Around 2003 when Lee was at the Erie County Holding Center with Allen, Allen asked Lee to confirm rumors that Smokey was a snitch.  Lee and Smokey were co-defendants in a federal case, and word on the street was that Smokey had "committed sales" against their head supplier, Earl Howard.  Lee told Allen that Smokey was "definitely one of them"; to his knowledge, there were multiple snitches.  Lee had pieced together discovery in his case, and assumed Smokey was a snitch from the information he gathered.

### 11. Crime Scene Evidence and Medical Proof

Photographs taken at the crime scene were received into evidence,[33] as was an autopsy report and photographs of Smokey's bullet wounds.[34]  Associate Chief Medical

---

[33] *See* Gov't Ex. ##300-313 (showing blood splatter stains in the street on Goodyear), 320-330 (depicting the cut-through or footpath from Goodyear to Bissell).  BPD Detective James Maroney, who took these photographs on April 6, 2005, testified at trial that placards 1 through 4 depicted in Exhibits 300 through 313 marked "wet, red stains" that the investigator believed to be blood.  On cross-examination, Detective Maroney agreed that these stains were out in the street on Goodyear, not on the sidewalk, and had there been any apparent blood stains on the sidewalk, he would have typically documented those.

[34] *See* Gov't Ex. #368 (Report of Autopsy performed 4/7/2005); *see also* Gov't Ex. ##336 (photograph of wound in chest) & 338 (photograph of wound in hand).  A single bullet was

Examiner Dr. Sung Ook Baik testified that the palm of Smokey's left hand showed evidence of a bullet wound, and the back of the left hand showed an exit wound. Smokey also had a bullet wound in his left chest; he was shot through the heart, the bullet also damaging one lung and one rib. Dr. Baik testified it was "highly possible" these injuries were consistent with Smokey holding out his left hand and getting shot through the hand, and the bullet then traveling through and landing in his chest.

### 12. Testimony of Lea Jones ("Lea")

The only defense witness at trial was Leo's and Joanie's daughter, Lea. Lea testified that she resided at 315 Newburgh up until 2010, with her parents and siblings. She knew Eldridge, and in 2005, when she was 13 years old, he did not reside at 315 Newburgh, or sleep on a couch or in a bedroom there. Eldridge visited "[h]ere and there," but he did not have friends over or meetings in the basement. She knew Speed, her cousin, would stop by "[h]ere and there," but she did not know if he did this in 2005. It would not have been out of the ordinary for Eldridge or Speed to be over at the house, as they were friends with Lea's brother, LeMario. Lea did not know Allen and had never seen him before, and she did not know Martin. The basement was never furnished, and in March and April of 2005, there was no door to it: it was an empty space with no furniture or couches, a television, a table, or garden tools. In 2003-2005, it looked like "a basement, with the laundry room." Lea never saw any meetings occur there, although she was not present every minute of every day as she attended school during the day.

---

recovered by Dr. Baik from the right side of Smokey's back. The report also states: "There is no evidence of close[-]range firing on the skin around the entrance of the bullet hole."

### B. *Testimony and Statements by Jeffrey Mills*

At trial, Jeffrey Mills was called by the Government to testify about his observations surrounding the murder of Smokey. After first refusing to be sworn in or to affirm to tell the truth, Mills was assigned counsel and agreed to take the oath and testify. Mills testified that Eldridge was his second cousin, but he denied remembering anything from the evening of the murder and stated he did not recall Eldridge making an admission to him after the murder, which was inconsistent with Mills's prior statements.[35]

After Eldridge's trial, an Indictment was returned in this District charging Mills with obstruction of justice. *See United States v. Jeffrey Mills*, 17-CR-73-RJA, Dkt. No. 1. Mills later entered a change-of-plea before this Court, and the following was the factual basis of his plea agreement:

> On or about February 26, 2015, the defendant was arrested for a domestic violence incident. On or about March 2, 2015, the defendant's parole officer served violation paperwork on the defendant. At that time, the defendant was asked if he had any information about homicides, guns or drugs that would be helpful to law enforcement. The defendant was asked if he had information about two unsolved homicides and a kidnapping/robbery that involved Thamud Eldridge. The parole officer relayed this information to the FBI, as the U.S. Attorney's Office indicted Eldridge for those criminal acts under case 09-CR-329-A.
>
> On or about May 21, 2015, the defendant's parole officer, an FBI Special Agent, a Task Force Officer with the FBI and an Assistant U.S. Attorney (AUSA), met with the defendant at the Erie County Holding Center for interviewing him regarding the information he had about the homicides and robbery/kidnapping.

---

[35] *Compare* Gov't Ex. #587A (Mills, FBI 302).

The defendant told the law enforcement officers and the AUSA that Thamud Eldridge was his cousin and that Eldridge was also known as "Damu." The defendant relayed this information about the murder of Sam Jones, Jr., also known as "Smokey." The defendant remembered that the night Smokey was killed[,] the defendant was riding a bicycle on Bissell Avenue when he heard gunshots. The defendant saw his cousin Eldridge run through the "cut" from Goodyear Avenue to Bissell Avenue. The defendant saw Eldridge get into a vehicle that was driven by Kevin Allen and depart the area. The defendant spoke with an individual who was also on Bissell Avenue, and the individual told the defendant that Eldridge tossed a gun to the individual after the shooting and asked that individual to "put that joint up," meaning to hide the firearm. The defendant said that after the murder of Smokey, his cousin Eldridge left Buffalo, New York and travelled to Atlanta, Georgia. After returning to Buffalo[,] Eldridge told the defendant that he (Eldridge) went to rob Smokey and "everything went wrong," meaning the defendant killed Smokey.

[...] at the conclusion of the interview, the AUSA told the defendant that he would be called as a witness in the trial against his cousin Eldridge.
On January 6, 2016, the defendant met with the AUSA and two law enforcement officers in Room 310 of the U.S. District Courthouse in Buffalo, New York for trial preparation. At that time, using trial exhibits that included crime scene photographs, the defendant again told the AUSA about hearing gunshots and then seeing his cousin Eldridge run through the "cut" from Goodyear Avenue to Bissell Avenue the night Smokey was killed. At the conclusion of the trial preparation, the AUSA told the defendant that he would be called as a trial witness.

On February 3, 2016, the prosecution called the defendant as a witness in United States v. Eldridge, et al., an official criminal trial proceeding over which United States District Court Judge Richard J. Arcara presided and for which the charges carried a maximum possible sentence of confinement for life. U.S. Marshals Service deputies escorted the defendant into the courtroom. As the defendant walked by his cousin Eldridge, the defendant winked his eye at Eldridge and

then sat on the witness stand. The defendant refused to be sworn and told the Court that, "it wasn't going to happen." The Judge cautioned the defendant about criminal contempt. The defendant was assigned counsel.

On February 4, 2016, the defendant took the stand again and agreed to take an oath. The AUSA examined the defendant regarding the murder of Smokey. In response to direct examination questions by the AUSA, the defendant testified falsely and feigned memory loss by repeatedly stating in response to questions that…he did not recall, did not remember and that he had no recollection of that day. The defendant willfully answered the AUSA's questions this way to impede the due administration of justice. The defendant admits to this conduct and further admits he acted with an improper purpose to protect his cousin from criminal exposure, and, in doing so obstructed justice in violation of 18 U.S.C. § 1512(c)(2).

17-CR-73-RJA, Dkt. No. 22, ¶¶ 4(a)-(g).

When Mills was sentenced, him and his attorney indicated that the reason he testified falsely was Mills's fear about what Eldridge might do to him or his family should he testify truthfully; Mills stated he did not want to "put [his] life on the line." This Court acknowledged Mills's extensive criminal history comprised of serious crimes but also "credited…[Mills's] claim that he had been afraid to testify against Eldridge," the latter which it found to be a mitigating factor when sentencing him to a below-Guidelines sentence of 65 months (the advisory range was 100 to 125 months). *See* 17-CR-73-RJA, Dkt. No. 32 (2/7/2018, Sentencing Tr.).

The Government asks that this Court consider, for the purposes of resentencing and in addition to the trial proof, the statements made by Mills after the trial. Eldridge argues in opposition that "the Court should not consider what Mills *would have said* if he

had testified [as anticipated by the Government] at trial" (emphasis at original), because

Mills's post-trial statements were never subject to cross-examination and therefore are

unreliable, and because Mills has a lengthy criminal history, and is therefore not credible.

The Second Circuit has held that "[t]he sentencing court's discretion is 'largely

unlimited either as to the kind of information he may consider, or the source from which

it may come.'" *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (quoting

*United States v. Tucker*, 404 U.S. 443, 446 (1972)); *see* U.S.S.G. § 6A1.3, Commentary;

18 U.S.C. § 3661.  In addition, "[b]oth the Supreme Court and [the Second

Circuit]…have consistently held that the right of confrontation does not apply to the

sentencing context[.]" *United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005)

(collecting cases); *see Carmona*, 873 F.2d at 574 ("It is not a denial of due process for the

trial judge, when determining sentence, to rely on evidence given by witnesses whom the

defendant could neither confront nor cross-examine…The fact that some material, upon

which the trial judge relied, may have had its source in a judicial proceeding in which

appellant was not a defendant or represented by counsel does not bar its use.").

Even so, "[a] sentencing conducted on the basis of unreliable or false information

violates the due process clause." *United States v. Fell*, 5:01-CR-12-01, 2018 U.S. Dist.

LEXIS 229652, *15 (D. Vt. Mar. 16, 2018).  By contrast, "[d]ue process is satisfied

when…statements are sufficiently corroborated by other evidence…In determining

whether the proffered evidence is reliable, the Court must assure itself that the evidence is

not materially incorrect, that there is not a significant possibility of misinformation…,

and that there is some minimal indicia of reliability accompanying the hearsay statements

51

sought to be admitted." *United States v. Newsome*, 3:20-CR-00058 (KAD), 2025 U.S. Dist. LEXIS 3574, *12 (D. Conn. Jan. 8, 2025) (internal quotation marks and citations omitted); *see also United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) ("[F]actual matters considered as a basis for sentence must have some minimal indicium of reliability beyond mere allegation.") (internal citations and quotation marks omitted)); U.S.S.G. § 6A1.3, Commentary ("Any information may be considered, so long as it has sufficient indicia of reliability to support its probably accuracy…Unreliable allegations shall not be considered.") (internal citations omitted).

This Court was able to thoroughly assess Mills's credibility by observing his tone, demeanor, and body language at Eldridge's trial, and at Mills's change-of-plea hearing and sentencing. At sentencing, the Court noted that Mills had provided detailed information about Eldridge's involvement in Smokey's murder "[o]n at least three prior occasions[.]" Mills undoubtedly has a lengthy criminal history, spanning over three decades, which the Court commented on and considered at Mills's sentencing. Nevertheless, the Court credited Mills's statements to the effect that he testified falsely at Eldridge's trial because he was afraid of Eldridge and the repercussions that he and his family could have potentially faced had he testified truthfully about Smokey's murder.

Mills's under-oath recantation of his trial testimony, *i.e.*, that he did not remember the night of Smokey's murder, is credible, especially considering Mills's family connection to Eldridge and his understandable fear of retribution. There was ample testimony at trial about Eldridge and his associates engaging in acts of violence, as well as testimony that they would threaten individuals who they thought might reach out to

law enforcement.  Moreover, at least some of the facts Mills admitted to in support of his plea of guilty were corroborated by independent sources of information.  Mills's admission that the night Smokey was killed, Mills was riding a bicycle on Bissell and he heard gunshots, saw Eldridge run through the shortcut from Goodyear to Bissell, and observed Eldridge run to and enter a vehicle driven by Allen and then leave the area, are corroborated by Martin's testimony that after Eldridge killed Smokey, Eldridge proceeded through the shortcut and to the getaway car.  Additionally, Mills's assertion that after Smokey's murder, Eldridge told Martin that he had murdered Smokey, comports with testimony by Neasman and Feaster about Eldridge's separate admissions concerning his involvement in Smokey's murder.  To a lesser degree, this admission is also corroborated by Cuyler's testimony that Eldridge revealed to him that he had people murdered in Buffalo.

As such, the Court will consider Mills's statements made after the trial of Eldridge and under the penalty of perjury, in conjunction with the evidence presented at trial, in determining whether Eldridge killed Smokey.  *See*, *e.g.*, *Martinez*, 2016 U.S. Dist. LEXIS 111581, at *12-16 (considering the factual basis of the co-conspirators' pleas, which "largely track[ed] the trial evidence," as well as "the totality of the trial evidence," in determining that the Government proved by a preponderance of the evidence that the defendant "paid for and arranged [the victim]'s premeditated murder").  Doing so does not violate Eldridge's due process rights because Eldridge was afforded the opportunity to object to the Court's use of such post-trial statements.  *See United States v. Ryan*, 406 F. App'x 565, 567 (2d Cir. 2011) (summary order) ("In deciding upon a sentence, a

district court has the discretion to rely on the wide array of facts before it…so long as the

defendant is given an opportunity to contest the accuracy of that information.").

### C. *Factual Findings*

"With regard to factfinding in connection with sentencing, the judge who presided

over the trial…is in the best position to assess the credibility of the witnesses[.]" *United

States v. Norman*, 776 F.3d 67, 78 (2d Cir. 2015) (collecting cases). "And just as a jury is

entitled to believe parts and disbelieve other parts of a witness's trial testimony, so is the

sentencing judge. Like any other factfinder who assesses witness credibility, the

sentencing judge is free to believe all, some, or none of a witness's testimony." *Id.* at 78

(internal quotation marks and citation omitted). Keeping these standards in mind, as well

as the others discussed herein, the Court evaluates the evidence presented by the

Government with respect to Smokey's murder.

The Court has of course considered the credibility of the Government witnesses

who testified at trial and acknowledges that "[t]he civilian witnesses are far from model

citizens and…many of them have extensive criminal histories" (*United States v. Ruth*,

578 F. Supp. 3d 392, 413 (W.D.N.Y. 2022)), as outlined above in the Court's summary of

their trial testimony. Some of these witnesses also received favorable plea deals or other

benefits in exchange for testifying. Nevertheless, the Court had a full opportunity to

observe the demeanor of these witnesses during the lengthy trial, and the Court finds the

testimony offered by the Government witnesses to be generally credible. *See United

States v. Carlton*, 442 F.3d 802, 811 (2d Cir. 2006) ("[T]he trial court did not err by

crediting [a witness]'s testimony despite his lengthy criminal history…The court was

entitled to do so because the government is often saddled with imperfect witnesses, and the finder of fact must evaluate their testimony despite the witnesses' shortcomings.").

The primary witness against Eldridge was, of course, Martin. Eldridge argues that Martin's testimony is undermined by, among other things, (1) inconsistencies between his testimony and the testimony of the other two eyewitnesses to the shooting, that is, Keith and Cindy; and (2) his failure to mention the shooter running through the cut-through in his January 19, 2006, statement to the BPD. The Court has considered all such arguments, as well as additional arguments advanced by the Defense at trial, including that Martin's version of events was implausible and internally inconsistent, he had an incentive to lie, and his testimony did not comport with other evidence presented at trial.

To start, Martin took nine months to provide information to law enforcement related to Smokey's murder, which was only after he was arrested and facing significant jail time. However, "it is not uncommon for a defendant to begin cooperating only after [he or] she is charged with a crime." *Ruth*, 578 F. Supp. 3d at 413. Moreover, Martin's failure to mention particular details of the crime in his initial statements to law enforcement, specifically, that Allen and Eldridge drove around the neighborhood prior to the shooting and that Eldridge ran through the cut-through after shooting Smokey, does not impeach his credibility. At most, Martin failed to divulge additional information beyond what was asked of him; he testified on redirect that the AUSA questioned him much more thoroughly in the grand jury than the BPD did in 2006.

55

The Court also disagrees with the Defense that certain aspects of Martin's testimony are patently incredible and therefore the Court should disregard his testimony in its entirety.

For example, Martin did not remain at Big Boys to warn Smokey about Eldridge and did not shout a warning to him as they walked down Goodyear, even though Smokey was Martin's cousin and he had recently gifted Martin $9,000 worth of crack and $2,500 in cash. But Martin did not fail to do anything to warn Smokey of the impending robbery. He had first warned Smokey days before the murder, after hearing Smokey's name among potential drug dealers the group could rob; he directed Jermain to warn Smokey before proceeding to his car; and he purposefully slowed his stride when he saw Smokey behind him on Goodyear to prevent the robbery. The Court finds that these conflicting actions on Martin's part reflect the internal conflict he was apparently experiencing and which he attempted to explain in his testimony: he was caught between his close friendship with and loyalty to Allen and the enterprise, and his family relationship with Smokey.

Additionally, while at first blush it is perplexing that Martin would not seek cover or attempt to run when the shooting occurred, Martin offered a logical explanation for opting to remain on the scene. His car was close so he had a quick escape, he had been present for many other East Side shootings so he was not afraid, and he knew that he was not the intended target so he understood that Eldridge would not shoot at him.

The Court has also considered that Martin's testimony differs in a couple of ways to the physical evidence presented through the Associate Chief Medical Examiner. First,

before the grand jury, Martin testified that Smokey's right hand was raised in front of his chest when he was shot at (at trial he could not recall which hand was raised), whereas the autopsy revealed that Smokey's *left* hand had been struck through with a bullet. Considering that Martin's testimony was given before the grand jury about 3 ½ years after the shooting, the Court concludes this discrepancy boils down to a lapse in memory or a mistaken observation. In any event, Dr. Baik concluded that the injury to Smokey's left hand, the bullet having entered the palm of his hand and having exited through the back of his hand, made it "highly possible" that Smokey had held out his left hand and he was then shot through the hand—a conclusion strongly supporting Martin's testimony that Smokey raised one of his hands in a defensive posture when Eldridge shot at him, and lending credence to Martin's account. Second, the autopsy report states that there was "no evidence of close[-]range firing on the skin around the entrance of the bullet hole," whereas Martin testified that the shooter was "[p]robably three feet" away from Smokey when he was shot and fell to the ground. Martin was not certain about this point of his testimony, and the Court readily finds that such testimony is the result of inadvertent error rather than deliberate falsehood.

With respect to Martin's testimony that Smokey was shot on the sidewalk, which is how he was able to observe Smokey holding up his hand as if to block the bullet, blood splatter stains were depicted in the street in the photographs presented at trial. The stains, while not on the sidewalk, do appear to be located close to the curb. The Court concludes that it is more likely than not that Smokey was shot close to the curb; he fell; and then he got back up, ran down the street, and collapsed to the ground. This explains the trail of

blood seen in the crime-scene photographs and aligns with the testimony of Keith and Cindy that Smokey ran after he was shot. It also makes sense that Martin did not see Smokey get back up and run because Martin quickly left the scene after Smokey was shot. Martin testified that after Smokey fell, Martin got into his car and drove around the block, and he did not know if Smokey died on the sidewalk.

Although Martin's account of the shooting diverges in various respects to the accounts given by Keith and Cindy—for example, regarding the number of gunshots,[36] if Smokey went to Yolanda's or across the street from Big Boys to sell drugs, and whether any cars were on Goodyear and how many individuals were on the street at the time of the shooting—the Court does not find the inconsistencies to be exculpatory to Eldridge. Rather, the Court concludes that such discrepancies resulted from "faulty memory, confusion, or mistake." *Lugo v. United States*, 06-CV-5400, 2008 U.S. Dist. LEXIS 106608, *28 (E.D.N.Y. Dec. 11, 2008). The shooting itself was a highly stressful and sudden event, the trial took place over one decade after the events of that evening, both Keith and Cindy were intoxicated at the time Smokey was shot, and the lighting was dim. Certainly, one would expect variations between the testimony of three individuals who observed such an event from different perspectives and who had distinct agendas and focuses that evening. *See United States v. Tucker*, 05-CR-711 (SAS), 2008 U.S. Dist.

---

[36] Eldridge's assertion that "other witnesses" testified there was only one gunshot, while Martin testified there were three, is not wholly accurate. Cindy testified to hearing just a single gunshot, but Keith's testimony did not so clearly contradict Martin's. Rather, Keith testified on direct examination that he heard what sounded like one or two gunshots, but then on cross-examination agreed instead that he heard "[t]wo, maybe three."

LEXIS 61636, *14 (S.D.N.Y. Aug. 13, 2008) ("[N]umerous contradictions in…witnesses' testimony…is not unusual; it would be both surprising and suspicious if two people gave entirely consistent detailed accounts of events that occurred several years ago."). The discrepancies, then, reflect the circumstances under which Martin, Keith, and Cindy observed the murder unfold, and they do not undermine the Court's conclusion that Eldridge shot Smokey on the night in question and that Allen was the getaway driver. In other words, the Court does not agree with the Defense that the three narratives of the shooting were so divergent that no trier of fact could conclude with any degree of certainty what occurred the evening of April 6, 2005. Rather, the Court can make these findings by a preponderance of the evidence.

Indeed, the Court concludes that Cindy observed Smokey approach Allen's vehicle and speak with Allen before the shooting. Cindy testified that Smokey appeared to know the driver of a vehicle that was parked on Goodyear and six or seven houses from Big Boys, and the driver was a light skinned black male. While she thought the car was white (rather than green, which both Martin and Sam testified was the color of Allen's car) and could not identify Allen as the driver, Cindy acknowledged that the lighting near the car "wasn't too good," and she was high on crack cocaine that evening.

The Court recognizes that Cindy's testimony concerning the location of Allen's car was inconsistent with Martin's testimony. According to Martin, he initially saw Allen's car pull up in front of Big Boys, on East Ferry, which is where Eldridge exited the car and where Martin approached the car and spoke with Allen. Martin testified that once he was partway down Goodyear and saw Smokey stop and speak with Allen, Allen was still

parked in front of Big Boys. Last, when Martin drove around the block to Bissell and back up to East Ferry after Smokey was shot, he saw Eldrige enter the same car on the corner of Goodyear and East Ferry, by Big Boys. But if Allen's car was parked on East Ferry during this enter chain of events, Martin would not have been able to see it from farther down Goodyear when he spotted Smokey speaking with Allen. The Court finds, then, that it is more likely than not that Martin misremembered the initial location of Allen's car on Goodyear, and that Allen was first parked on Goodyear and then moved his car to East Ferry before Eldridge and Allen made their escape from the area.

The Court also finds that Cindy saw Eldridge exit the cut-through just before he shot Smokey. She testified that she observed a dark-skinned black male walking on the sidewalk and then step off the sidewalk towards Smokey and near the location of the cut-throughs, before she heard someone yell, "drop it," and a gunshot.

Eldridge now draws attention to the fact that the Government did not present certain physical evidence linking him to the murder. At trial, the Government showed the jury photographs of a set of footprints located in the cut-through, presumably to show that there was a single perpetrator.[37] Eldridge complains that the Government failed to conduct forensic analysis of the footprints, or DNA testing of Eldridge's boots that were in the Government's possession and allegedly contained blood. The Court concludes that

---

[37] See Gov't Ex. ##320-330 (markers A through D depicting shoe- or boot-print impressions in the cut-through connecting Goodyear with Bissell). Detective Maroney testified that a forensic examiner would have a "[v]ery difficult time" determining an exact shoe size of the footprints even with a ruler beside them in the photographs because the boots or shoes had pressed into mud on the ground, obscuring their actual size.

the Government satisfied its burden even absent such evidence. *See United States v. Gilbert*, 3:20-CR-00058 (KAD), 2025 U.S. Dist. LEXIS 7719, *25 (D. Conn. Jan. 15, 2025) ("The Court agrees that forensic evidence tying [the defendant] to the crime, or an eyewitness would make for a stronger case, but such direct evidence is not required. Indeed, a conviction may be premised entirely on circumstantial evidence and the inferences that may reasonably be drawn therefrom.") (citing *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994) ("[C]rimes may be proven entirely by circumstantial evidence.")); *see United States v. Lee*, 660 F. App'x 8, 15 (2d Cir. Aug. 24, 2016) (summary order) ("No particular type of evidence is required[.]").

Here, while there is no direct physical proof that Eldridge killed Smokey, there was eyewitness testimony by Martin that Eldridge did so. Martin consistently maintained since he first spoke with law enforcement in 2006 that he saw Eldridge shoot Smokey and that Allen was the getaway driver. The post-trial statements of Mills corroborate Martin's testimony, as does the testimony of Smokey's father, Sam, concerning Allen and Eldridge driving around the neighborhood in a green car together before the murder. The Court infers that the pair was casing the neighborhood prior to the shooting.

Importantly, in addition to the testimony of Martin and other proof corroborating his testimony, Mills indicated that Eldridge admitted to Mills that he had tried to rob Smokey and "everything went wrong," meaning he had killed Smokey. Furthermore, two trial witnesses testified that Eldridge admitted to killing Smokey, and Eldridge made these admissions at different times and under different circumstances. Neasman testified that in June or July of 2005, Eldridge admitted to him outside of Neasman's marijuana

61

house that "they got money for knocking him off," in reference to Smokey. Furthermore, Feaster testified that Eldridge admitted to him while they were incarcerated together in August to October of 2009, in connection with Smokey's murder, that Eldridge got Smokey "out [of] the way" because Smokey was a "snitch." The admission to Feaster followed Eldridge's endeavors to deflect suspicion onto someone else. Eldridge had made repeated requests to Feaster that he convey to his lawyer false information that an individual named "Reese" killed Smokey—attempts by Eldridge to falsely exonerate himself that the Court finds evince his guilty state of mind.

Cuyler also testified about Eldridge's admissions made to him in jail in 2009; Eldridge said that "he had people killed and tooken [sic] care of" in Buffalo. The Court finds Cuyler's testimony particularly persuasive, taken together with the testimony of Neasman and Feaster, as Cuyler was from Rochester (not Buffalo), and he credibly testified that he provided this information to the FBI for two reasons: he wanted to get out of jail, and he did not like how Eldridge was exploiting younger people. Cuyler also testified that he was receiving no benefits in exchange for his testimony, and he had no felony convictions.

Additionally, Lloyd testified that at a neighborhood barbeque following Smokey's death, in response to a comment, "that's fucked up what happened to Smokey," Allen replied, "fuck that rat ass nigga. He deserved what he got. *We* had to do him" (emphasis added). In other words, Allen admitted that he and Eldridge had killed Smokey.[38]

---

[38] During Lloyd's direct examination, the Court sustained an objection on hearsay grounds to Lloyd's testimony that someone standing near him at the barbeque stated that one of the two

Eldridge asserts that the Court should not rely on the testimony of several convicted felons with extensive criminal histories in determining his involvement in the murder of Smokey.  At trial, the Defense argued that all the Government witnesses lied to the grand jury, in their 302's, and on the stand simply to cut down their own jail time.  However, "[t]o reject this evidence offered from several different witnesses, as advanced by [Defendant], the Court would likely have to conclude that the government's fact witnesses had learned of the [Smokey] homicide in the community and then conspired together (or with law enforcement) to frame [Defendant].  That scenario is just not plausible."  *Ruth*, 578 F. Supp. 3d at 415.

All the foregoing credible evidence, both direct and circumstantial and taken together, supports by a preponderance of the evidence that Eldridge murdered Smokey on April 6, 2005.  *See United States v. Falls*, No. 12-4652-cr, 543 F. App'x 54, 60-61 (2d Cir. Nov. 1, 2013) (summary order) ("Although there were some inconsistencies between [the primary Government witness]'s testimony and some of the other evidence, the district court fairly found that those inconsistencies paled in comparison to the consistency of the government's evidence on the whole, especially given the relatively low preponderance-of-the-evidence standard that applies.").

---

people exiting Allen's car with him was "Damu" (Eldridge).  The Court agrees with the Government that it may now consider this hearsay statement for the purposes of sentencing, under 18 U.S.C. § 3661.

**D. *Conclusions of Law***

The Court has determined that the Government has proven by a preponderance of the evidence that Eldridge personally murdered Smokey, and it further concludes that the murder is relevant to Eldridge's offenses of conviction under Guideline § 1B1.3.

As noted previously herein, the Government charged Eldridge with the robbery and murder of Smokey both as independent offenses (Counts 13, 14, and 15), and as RA 6 of Count 1 charging racketeering, and Overt Act 6 of Count 2 charging racketeering conspiracy. At trial, the jury found Eldridge guilty of Counts 1 and 2 but was unable to reach a verdict on RA 6 or Overt Act 6. The jury was also unable to reach a verdict as to the murder of Smokey in aid of racketeering (Count 13), the robbery of Smokey (Count 14), or the use of a firearm causing Smokey's death (Count 15).

Relevant conduct includes all acts "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant. . . [and] that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). "When the offense of conviction is a RICO conspiracy, relevant conduct may include underlying predicate acts, even if not proven at trial beyond a reasonable doubt, as long as the sentencing court finds that they were proven by the lower preponderance of the evidence standard." *United States v. Massino*, 546 F.3d 123, 135 (2d Cir. 2008) (per curiam) (internal quotation marks and citations omitted); *see*, *e.g.*, *United States v. Ward*, No. 3:17-CR-171 (MPS), 2019 U.S. Dist. LEXIS 202975, *16-23 (D. Conn. Nov. 22, 2019) (after a *Fatico* hearing, finding that

defendant personally shot and attempted to murder a rival gang member, and that such shooting was in furtherance of the enterprise's conspiracy, making it relevant conduct to the offense of RICO conspiracy to which defendant had entered a plea of guilty).

"The RICO Sentencing Guideline, U.S.S.G. § 2E1.1, instructs courts to apply the greater of a base level 19 or 'the offense level applicable to the underlying racketeering activity.'" *United States v. Hopper*, 2022 U.S. App. LEXIS 12945, *2-3 (2d Cir. May 13, 2022) (summary order) (quoting § 2E1.1(a)(2)).  The U.S. Probation Office correctly identified § 2E1.1 as the applicable offense Guideline for RA 6 of Count 1 and Overt Act 6 of Count 2, which are grouped for Guidelines calculation purposes pursuant to Guideline § 3D1.2(a).  In the Probation Officer's and the Court's view, the evidence at trial established by a preponderance that Eldridge murdered Smokey as a part of the racketeering conspiracy, thus requiring a base offense level of 43 for that count group. *See* U.S.S.G. § 2A1.1(a) (First Degree Murder).

First-degree murder under 18 U.S.C. § 1111 is "the unlawful killing of a human being with malice aforethought," and requires a "willful, deliberate, malicious, and premeditated killing." *United States v. Torres*, 629 F. Supp. 3d 86, 93-94 (S.D.N.Y. 2022) (quoting 18 U.S.C. § 1111).  Additionally, "[k]illings during and as a consequence of a knowing and willful…robbery [or attempted robbery] are felony murders under § 1111(a)." *United States v. Montalvo*, 467 F. Supp. 3d 136, 142 (W.D.N.Y. 2020) (citing *United States v. Thomas*, 34 F.3d 44, 48 (2d Cir. 1994) (quoting § 1111 ["Every murder…committed in the perpetration of, or attempt to perpetrate, any…robbery…is murder in the first degree."])).  The Court easily concludes that under either theory of

65

prosecution, Eldridge committed first-degree murder.  He either killed Smokey during an attempted robbery, or he acted with malice aforethought and premeditation when he killed Smokey as he believed him to be a "snitch."

On the question of whether the first-degree murder of Smokey qualifies as relevant conduct, Eldridge's racketeering and racketeering conspiracy offenses of conviction involved conduct from in or about 2003 until in or about December of 2005.  Smokey was killed on April 6, 2005, squarely within this timeframe.  As this Court has previously recognized, though:

> The Second Circuit has stated that: "The phrase 'occurred during the commission of the offense of conviction['] [in § 1B1.3(a)(1)] is not defined in the Guidelines, nor does the commentary provide any guidance.  The words 'relevant conduct' suggest more is required than mere temporal proximity, as the other conduct must be 'relevant' and it must occur 'during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

*Montalvo*, 467 F. Supp. 3d at 145 (quoting *United States v. Ahders*, 622 F.3d 115, 122 (2d Cir. 2010)), *aff'd*, 20-4176-cr, 2022 U.S. App. LEXIS 25968 (2d Cir. Sept. 16, 2022) (summary order).  "In other words, [o]ne criminal act does not become 'relevant' to a second act under the Guidelines by the bare fact of temporal overlap."  *Ruth*, 578 F. Supp. 3d at 417 (quoting *United States v. Plaza*, 756 F. App'x 37, 46 (2d Cir. 2018) (summary order)); *see United States v. Anderson*, 689 F. App'x 53, 58 (2d Cir. 2017) (summary order) ("Though facially expansive, this Court has explained that to qualify as 'relevant conduct' under § 1B1.3(a)(1), the conduct must occur *in the course* of commission of the offense of conviction.") (internal quotations, citation, and alterations omitted).

Here, there is more than just temporal overlap to establish how the murder of Smokey was connected to the offenses Eldridge was convicted of, thereby triggering the application of § 2A1.1(a). The Court concludes that although there was varying proof regarding the motive for the attempted robbery and murder of Smokey,[39] the murder was nevertheless shown by a preponderance of specific evidence to arise in the course of the commission of Eldridge's racketeering offenses of conviction. Stated differently, there is testimony to support this Court's preponderance finding that Smokey's murder was connected to the RICO offenses of which Eldridge was convicted at trial.

As this Court previously stated in its Decision and Order denying Eldridge's and Allen's post-trial motions, "the evidence presented…demonstrated that…the primary purpose of [the enterprise] was to sell narcotics and to rob drug dealers of money and narcotics." Dkt. No. 710, p. 16.[40] In addition, in rejecting Eldridge's argument that his convictions on Counts 1 and 2 should be dismissed because there was insufficient evidence "as to the existence of a racketeering enterprise" and insufficient evidence that he was "part of an enterprise with Allen and Speed," the Court concluded that the totality of the trial testimony "establishes that Eldridge, Allen, and Speed were members of a

---

[39] Eldridge highlights that at the start of the trial, the Government asserted that Smokey's murder was a "robbery gone bad," but during summation, the Government's theory changed to a "murder-for-hire scenario" where Eldridge had been paid to murder Smokey.

The Court uses the term "attempt" because there was no evidence at trial that any money or drugs were stolen from Smokey.

[40] The Superseding Indictment alleged that "[t]he principal purpose and objective of the enterprise was to obtain money and things of value. To achieve that purpose and objective, members of the enterprise committed acts of murder…and robbery…" Dkt. No. 164, ¶ 3.

continuing criminal organization that obtained money and other things of value through drug distribution, robberies, intimidation and acts of violence, and that they recruited and directed others to assist in these activities." Dkt. No. 710, pp. 16, 19. The Court further commented that "there was a plethora of testimony that Eldridge and co-conspirators routinely targeted drug dealers for robberies." Dkt. No. 710, p. 21.

Specifically with respect to Smokey's murder, there is ample proof for the Court to find that both motives for the shooting, as well as one or the other of the motives for the shooting standing alone, connect the murder to the offense of conviction.

As to the first motive, evidence was presented from which the Court may conclude that Smokey was among the drug dealers targeted by the enterprise; he was targeted for a robbery because it was well-known that he was making significant profits from his sales of crack cocaine in the neighborhood and/or because he had recently won $30,000 in the lottery; and Eldridge shot Smokey during the attempted robbery that was intended to fulfil the main purpose and objective of the enterprise, that is, "to obtain money and things of value" by robbing Smokey of money and/or drugs. Dkt. No. 164, ¶ 3. Indeed, trial testimony indicates that the attempted robbery of Smokey was part of a string of robberies planned by the enterprise in the basement of 315 Newburgh and committed in the earlier part of 2005. In addition, Allen, an accomplice to the murder who took part in the RICO conspiracy, informed Martin before Eldridge shot Smokey, "Watch this cousin, we about to get Smokey."

With respect to the second motive, there was also evidence presented at trial that Eldridge murdered Smokey because he believed Smokey was a "snitch." Around 2003,

Allen—again, Eldridge's co-conspirator—inquired of Lee whether rumors that Smokey was a "snitch" were true. MBG member Lee testified that he told Allen that Smokey was "definitely" one of the co-defendants in Lee's federal case who was "snitching." Smokey's Uncle Leo also testified that he learned Smokey, among others, were informing on him in his federal case—and he had learned this from Smokey himself. Moreover, when Eldridge made admissions to Feaster about the murder, Eldridge stated, "[Smokey] was a snitch. I had to get him out the way." If the motive for Smokey's murder was that Eldridge and Allen believed Smokey was "snitching," the murder was more likely than not done to further the objectives of the enterprise, that is, to "[p]reserve and protect the power, territory, and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults and murder," and to "[k]eep victims in fear of the enterprise and in fear of its members and associates through threats of violence." Dkt. No. 164, ¶ 3(a), (c).

In short, Eldridge murdered Smokey in furtherance of, and to protect his interest in, the enterprise, and the murder "occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1). The killing of Smokey was motivated by financial gain—to enrich the members of the enterprise—and/or to preserve and protect its profits, power, and territory. *See*, *e.g.*, *United States v. Mitchell*, 51 F. App'x 355, 357 (2d Cir. 2002) (summary order) ("That the robbery may have been initially proposed because of a personal feud between [an accomplice and co-conspirator] and [the attempted robbery victim and out-of-state drug buyer] is of no import; [the defendant] and other members of the enterprise became involved in and were central to the robbery, which was clearly

related to the other activities of the enterprise (namely, robbing drug dealers for economic gain).").  It is readily apparent that Smokey's murder was part and parcel of a pattern of activity, and not a standalone event.  *Compare Ruth*, 578 F. Supp. 3d at 420 ("[T]he government has failed to articulate how the robbery and murder of [the victim]…was connected to the [drug trafficking] offenses to which [defendant] pleaded guilty, and the evidence before this Court suggests that [the victim]'s murder was the result of a garden-variety robbery.  Accordingly, the cross-reference to U.S.S.G. § 2A1.1(a) does not apply.").

The Court finds that, based on a preponderance of the evidence, the murder involved in RA 6 and Overt Act 6, *i.e.*, the murder of Smokey, was relevant conduct to the racketeering conduct of which Eldridge was convicted.

## V.    The Murder of Flap – April 2 or 3, 2005

The Government concedes in its resentencing papers that "evidence that Eldridge murdered Flap is weaker than the evidence that Eldridge murdered Smokey."  Dkt. No. 961, p. 19.  Upon independent review of the proof concerning Flap's murder, the Court agrees with this sentiment, but the Court need not analyze the proof herein because it will not affect sentencing.  *See* Fed. R. Crim. P. 32(i)(3)(B) (the district court "must—for any disputed portion of the presentence report…—rule on the dispute *or determine that a ruling is unnecessary* either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing") (emphasis added).  Having found that Eldridge murdered Smokey and Smokey's murder is relevant conduct to Eldridge's offense of conviction under Guideline § 1B1.3, Eldridge's total offense level and

Guidelines range would remain unchanged regardless of whether the Court makes findings with respect to the murder of Flap.

As calculated in the revised presentence investigation report (Dkt. No. 966), should this Court hold Eldridge responsible for both murders and find that they are relevant conduct to Eldridge's RICO offenses of conviction, the combined adjusted offense level is 45 (the count group for each murder would receive 1 unit under the multiple count adjustment and the total number of units would be 2, resulting in a 2-level increase in the offense level).  *See* U.S.S.G. § 3D1.4.  The total offense level would exceed 43 but it would then be treated as level 43 pursuant to the Guidelines.  *See* U.S.S.G. Ch. 5, Pt. A, cmt. n.2 ("An offense level of more than 43 is to be treated as an offense level of 43.").

This Court has found that Eldridge murdered Smokey and that such conduct is relevant to his RICO offenses.  Whether Eldridge is responsible for Flap's murder makes no difference in terms of Guidelines calculations.  Indeed, the sole murder count group (murder and conspiracy to commit robbery of Smokey) results in a base offense level of 43, and that count group would receive 1 unit under the multiple count adjustment because it is the count group that produces the highest offense level.  Pursuant to § 3D1.4, there would be no increase in offense level from 43, the greater of the adjusted offense levels.  Thus, the combined adjusted offense level would be 43 instead of 45, but the total offense level would be a 43—the same total offense level as if the Court made a finding regarding Flap's murder.

## CONCLUSION

The Court finds it is more likely than not that Eldridge committed the murder of Smokey, based on the credible evidence before it.  It further finds that the Smokey homicide is "relevant conduct" to racketeering and the racketeering conspiracy of which Eldridge was convicted.

The parties shall appear on **June 18, 2026, at 11:30 a.m.**, for the resentencing.[41] The U.S. Probation Office is directed to prepare an updated presentence investigation report removing from its Guidelines calculations the count group pertaining to Flap, and making any other revisions it deems necessary, by no later than **April 10, 2026**.  Any further submissions by Eldridge pertaining to the sentencing, such as a request for a downward variance under 18 U.S.C. § 3553(a), shall be submitted by **May 8, 2026**.  Any further submissions by the Government, including any response to Eldridge's supplemental sentencing submissions, are to be filed by **May 29, 2026**.


**SO ORDERED.**


_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT


Dated:   March 9, 2026
          Buffalo, New York

---

[41] Eldridge's pending objections (Dkt. No. 955) to the report, which the Government responded to (*see* Dkt. No. 958, pp. 1-3) and the U.S. Probation Office addressed in an addendum to its report (*see* Dkt. No. 966, pp. 48-51), will be addressed in a forthcoming Decision and Order, in the short-term.